**In re Clyde W. MARKER, Debtor.**

**Alan E. CECH, Trustee, Plaintiff,**

**v.**

**Clyde W. MARKER, Richard Marker, and George E. Marker & Sons, Inc., Defendants.**

**Bankruptcy No. 91–1683–BM. Adv. No. 91–0480–BM.**

United States Bankruptcy Court, W.D. Pennsylvania.

July 22, 1992.

**736**

Alan E. Cech, Flaherty & Sheehy, P.C., Pittsburgh, Pa., for plaintiff.

Mark L. Glosser, Stone, Glosser & Stone, Pittsburgh, Pa., for defendant/debtor Clyde W. Marker.

Darlene M. Nowak, Marcus & Shapira, Pittsburgh, Pa., for defendants Richard Marker and George E. Marker & Sons, Inc.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Debtor Clyde W. Marker ("debtor") and Richard Marker each owned approximately 33.3% of the issued shares of the capital stock of George E. Marker & Sons, Inc. ("GEM") prior to the death of George Marker. The remaining shares had been owned by George Marker. The chapter 7 trustee seeks a determination in the above-captioned adversary action that debtor owned fifty percent (50%) of the outstanding capital stock of GEM at the time of the filing of debtor's bankruptcy petition.

The trustee opines that GEM purchased the shares owned by George Marker after his death pursuant to a stock option agreement and converted same to treasury stock. The trustee also maintains, as an alternative theory, that said shares passed to debtor and to Richard Marker in equal shares pursuant to the last will and testament of George Marker and that debtor's so-called "disclaimer" of his interest in said shares was at best a "renunciation" which is avoidable under Pennsylvania law as a fraudulent conveyance. The trustee theorizes, and the court agrees, that this action was merely a transparent after-the-fact legal maneuver designed to reduce debtor's assets. In this way debtor sought to diminish the ability of his ex-wife to collect a family court's order of equitable distribution.

Defendants deny that GEM ever purchased the shares of its capital stock which had been owned by George Marker and deny that any such purchase which might have taken place was valid under the provisions of the stock option purchase agreement and/or the laws of Pennsylvania. In addition, defendants deny that any of the shares of GEM stock owned by George Marker ever passed to debtor by virtue of the former's last will and testament. Defendants contend that the "disclaimer" executed by debtor was indeed a disclaimer, not a renunciation, and insist that debtor never had any interest in George Marker's shares of GEM as a result of the disclaimer and therefore was incapable of transferring them, fraudulently or otherwise.

For the reasons hereinafter advanced, judgment will be entered in favor of the trustee and against defendants. Debtor owned fifty percent (50%) of the shares of capital stock of GEM on the day he filed his petition in bankruptcy.

–I–

## FACTS

GEM is a closely-held corporation formed in 1968 by debtor, Richard Marker, and George Marker. Richard Marker is debtor's brother. George Marker is their father. The evidence offered in the bankruptcy case generally, and this adversary action specifically, convinces the court that these parties utilized the corporate fiction when it was to their advantage and as a general rule treated their individual actions as the corporation's actions.

All the capital stock issued by GEM was owned by them on November 27, 1974. Debtor owned 226 shares; Richard Marker owned 226 shares; and George Marker owned 228 shares. As of that date, debtor and Richard Marker each owned 33.235% of GEM's capital stock. George Marker owned the remaining 33.53%.

On February 21, 1977, debtor, Richard Marker, George Marker, and GEM executed a stock option agreement. The declared intent of the agreement was to ensure that debtor and Richard Marker each

owned fifty percent (50%) of GEM's capital stock upon the death of George Marker. Debtor and Richard Marker were granted an option by George Marker to purchase his shares of GEM's capital stock from his estate within one (1) year of his death for $5,000.00. GEM was granted an option to purchase said shares from his estate for $5,000.00 during the second year after his death in the event debtor and Richard Marker did not execute their option during the first year. The agreement further provided that debtor, Richard Marker, and GEM were not obligated to exercise their options. Should they elect to exercise their option, however, the estate of George Marker was obligated "to transfer forthwith the stock certificates, properly endorsed, which are the subject of any such option".

George Marker married Beulah Marker subsequent to February 21, 1977, but prior to February 21, 1981.

On February 21, 1981, George Marker executed a document entitled "Last Will And Testament" in which he left all 228 shares of his GEM stock in equal portions to debtor and Richard Marker. The intent was identical to the declared intent of the stock option agreement—i.e., to ensure that debtor and Richard Marker each owned fifty percent (50%) of GEM's capital stock after George Marker's death.

Debtor, Richard Marker, and George Marker, the sole principals of GEM, on occasion and at their whim directed GEM to award them bonuses. No specific reason, such as superior effort or unusual earnings, was advanced for these bonuses. Instead of receiving their bonuses in cash, they ordinarily "loaned" said sums back to GEM, which then posted them to an interest-bearing account designated as "shareholder loans". The amount due and owing to George Marker as a result of such loans as of June 30, 1985, was $8,761.04.

George Marker died on October 11, 1986. Richard Marker became President of GEM and debtor became its Secretary–Treasurer upon their father's death.

On December 24, 1986, approximately ten (10) weeks after George Marker's death, a check in the amount of $5,000.00 written on an account of GEM was made payable to Beulah Marker, the widow of George Marker. The check was written and signed by GEM's Secretary–Treasurer (debtor), and contained, in debtor's handwriting, the notation "Stock" on the front of the check.

GEM's check disbursement ledger indicates that only four (4) checks had been posted to the shareholder loan account during fiscal year 1986. One of the checks so listed in the disbursement ledger was the check in the amount of $5,000.00 payable to Beulah Marker which had been issued on December 24, 1986. The remaining three (3) checks so listed in the disbursement ledger were for payment of accrued interest. One check was payable to debtor in the amount of $1,047.00. Another check was payable to Richard Marker in the amount of $1,538.00. The third check was payable to "Cash" in the amount of $496.00 and was endorsed by Beulah Marker. It is stipulated that said checks were in payment of interest to the principals (including decedent George Marker) on the shareholder loans.

The check payable to Beulah Marker in the amount of $5,000.00 did *not* contain any notation on it indicating that it should be posted to George Marker's shareholder loan account. The entry to that effect in the check disbursement ledger was made by GEM's bookkeeper, who was unaware in December of 1986 of the stock option agreement described previously. The bookkeeper purportedly inferred that the purpose of the check was to reduce the amount owed to George Marker for shareholder loans. As a fail-safe, the bookkeeper knew that the check disbursement ledger would be later reviewed by GEM's certified public accountant after consultation with debtor and that errors would thereby be corrected.

Although the check disbursement ledger indicated that the check in the amount of $5,000.00 issued to Beulah Marker was in partial payment of George Marker's shareholder loans, the shareholder loan account itself did *not* reflect such a payment. The only entries posted to the shareholder loan

account of George Marker during fiscal year 1986 were the above interest payment of $496.00 in December of 1986 and the crediting of $525.00 in interest. Notwithstanding the notation in the check disbursement ledger, the check in the amount of $5,000.00 issued to Beulah Marker on December 24, 1986 was never posted to the shareholder loan account. No additional entries to the loan balance owing to George Marker have been posted since December of 1986.

GEM's fiscal year runs from July 1st of a given year through June 30th of the following year. The books and financial records of GEM prior to fiscal year 1986 give no indication of the existence of any treasury stock. Starting with fiscal year 1986, during which George Marker died, certain documents and records maintained by GEM reflect the existence of treasury stock valued at $5,000.00. GEM's balance sheet for fiscal year 1985—i.e., as of June 30, 1986—did *not* reflect any treasury stock. However, its balance sheets for every fiscal year thereafter reflect the existence of treasury stock valued at $5,000.00 Also, its federal tax returns for tax year 1986 and for every tax year thereafter indicate the existence of treasury stock valued at $5,000.00.

Certain documents prepared personally by debtor and by Richard Marker subsequent to December of 1986 represented that each of them owned fifty percent (50%) of GEM's capital stock. Debtor represented in a financial statement dated October 23, 1989, that he owned fifty percent (50%) of the stock. Richard Marker represented in financial statements dated September 1, 1988 and October 11, 1989 that he owned fifty percent (50%) of the stock.

Debtor commenced acrimonious divorce proceedings in state court in 1987 against his then-wife, Ann Marker. An order was issued by that court on November 3, 1988, awarding her alimony *pendente lite* and child support of $1,500.00 per month.

No steps were taken to probate George Marker's last will and testament until nearly three (3) years after his death. Letters testamentary were issued to Beulah Marker on August 21, 1989.

A pretrial conference concerning equitable distribution in the divorce proceeding was held on March 5, 1990. That same date—i.e., March 5, 1990—, debtor executed and filed in state court a so-called "disclaimer" whereby he purportedly disclaimed any interest in the estate of George Marker.

Debtor and Ann Marker were granted a divorce in December of 1990.

The following GEM stock certificates had been issued on February 10, 1977, approximately ten (10) days prior to execution of the stock option agreement. Certificate Number 7 for 228 shares had been issued to George Marker. Certificate No. 8 for 226 shares had been issued to debtor. Certificate Number 9 for 226 shares had been issued to Richard Marker. All extant GEM stock certificates were stored in a safe deposit box under the exclusive control of GEM.

On February 13, 1991, an assignment of Certificate Number 7 purportedly had been executed by Beulah Marker. This execution allegedly occurred at the same time the parties signed the Family Settlement Agreement. Except for her signature, the assignment on the reverse side of the certificate was left blank. The name of the assignee, the number of shares transferred, the date of execution, and the signature of the witness to Beulah Marker's signature were left blank. The document was not notarized, and clearly was not notarized by GEM employee Joy Bell.

Certificate Number 7, containing only Beulah's signature on it, was mailed in February of 1991 by debtor to counsel for the estate of George Marker. The document arrived at counsel's office in an envelope without markings so as to identify the sender. Aside from this incomplete document, no other documents were included.

Defendants aver that contemporaneously with the execution of Certificate No. 7 by Beulah Marker on February 13, 1991, debtor, Richard Marker, and Beulah Marker in her individual capacity and as executor of the estate of George Marker, executed a document entitled "Family Settlement

Agreement". Said document provided, *inter alia,* that all 228 shares of GEM stock belonging to the estate of George Marker were to be distributed to Richard Marker. This document obviously was professionally prepared and the formal proceeding was evidenced by GEM's employee Joy Bell's signature and notary seal. That same day, Certificate Number 7 was canceled in GEM's stock transfer book and was replaced by Certificate Number 11, which was issued to Richard Marker for 228 shares.

A final decree was entered on March 20, 1991 in the divorce proceeding between debtor and Ann Marker. Ann Marker was awarded, *inter alia,* a liquidated sum of $174,000.00.

On May 17, 1991, approximately seven (7) weeks after the final decree had been issued in the divorce proceeding, debtor filed a voluntary chapter 7 bankruptcy petition. The obvious and primary purpose of this filing was to seek discharge of this debt as a property settlement as opposed to an award for alimony and/or support.[1]

A chapter 7 trustee was appointed shortly after the bankruptcy petition was filed. On August 16, 1991, the trustee commenced the adversary action which is before the court at this time.

–II–

ANALYSIS

A. *The Stock Option Agreement.*

The trustee maintains that GEM purchased its shares of capital stock owned by George Marker in accordance with the terms of the stock option agreement and converted them to treasury stock. Defendants deny that GEM purchased George Marker's shares of its stock pursuant to the stock option agreement when the check payable to Beulah Marker in the amount of $5,000.00 was issued on December 24, 1986. Said check, defendants maintain, was issued because Beulah Marker was in dire financial straits as a result of George

Marker's death and was intended as partial payment of shareholder loans by George Marker to GEM.

Defendants also deny that GEM's exercise of that option, if indeed that is what transpired, was valid for several reasons.

Defendants alternatively insist that if the court believes that GEM did in fact purchase the shares, that the purchase of the stock by GEM was "ineffective"—i.e., that it was a nullity—because said purchase was not in accordance with the provisions of the stock option agreement. According to defendants, the option would have been improperly exercised by GEM in the first year after George Marker's death. Debtor and Richard Marker had an exclusive option during the first year. GEM's option could be exercised only in the second year and only if debtor and Richard Marker had not exercised their option during the first year.

Defendants maintain that GEM's purchase of the stock also was a nullity because it was in violation of Pennsylvania law. According to defendants, Beulah Marker lacked authority under Pennsylvania law to sell the stock on December 24, 1986 because letters testamentary had not yet been issued to her. Also, defendants contend that the purchase by GEM was invalid because it was not authorized by resolution of its board of directors, as required by Pennsylvania law.

■ Defendants' various contentions are without merit. The evidence establishes, and the court so finds, that GEM purchased its capital stock which had been owned by George Marker when a check drawn on its account in the amount of $5,000.00 made payable to Beulah Marker was issued on December 24, 1986.

Debtor and his brother, with the assistance of their father, George, created and built the business from nothing to a thriving concern. It was the family's intent that after George's passing that the busi-

---

1. On April 17, 1992, 139 B.R. 615, a Memorandum Opinion and Order were issued wherein it was determined that the debt was in the nature of alimony or support as opposed to a property settlement agreement. Accordingly, pursuant to

11 U.S.C. § 523(a)(5), said debt is not dischargeable. Debtor has appealed that Order to the U.S. District Court wherein the matter is pending.

ness would be equally owned by the brothers. We refuse to accept that three and one-half (3½) years after their father's death, debtor, for reasons unrelated to his marital difficulties, suddenly desired to be a minority shareholder. To the contrary, we believe that these legal maneuvers were an inartfully-drawn scheme to avoid the effect of the alimony and support action in the state court. On July 29, 1988, at a time prior to this issue being joined, debtor, while represented by counsel, testified that GEM had purchased decedent George Marker's stock when it tendered to Beulah Marker at the December 1986 Christmas party the draft in the amount of $5,000.00. Subsequently the parties acknowledged publicly to lending institutions that they were equal owners of GEM. This representation was correct as GEM now owned George Marker's shares. If a shareholders meeting was required, the brothers met without notice to any outsider. If this matter had not been resolved at the Christmas party of 1986, then the attendance of others would have been required. The brothers continued forward, knowing that notice had been given to the owners of decedent father's shares when *they* were in attendance at the corporate meeting.

The contention that the check was made payable to Beulah Marker during GEM's annual Christmas party solely because she was in desperate need of money must be rejected. GEM was under the complete control of debtor and Richard Marker. Relations between them and Beulah Marker were strained because they strenuously disapproved of their father's marriage to Beulah Marker immediately after the death of their mother. It strains at credulity to believe that they would be so generous to Beulah Marker in light of the strained relations. We are certain that if that were the case, defendants would have paraded Beulah Marker to the witness stand whereupon she would have testified in support of their position. Their failure to do so strongly suggests that her account of the reason for the check issued on December 24, 1986 is at odds with defendants' account. The check was *not* issued as a token of Yuletide generosity befitting the spirit of Christmas.

The contention that the check was intended as partial payment of George Marker's shareholder loan account is refuted by evidence adduced at trial. The entry to that effect in GEM's check disbursement ledger was incorrect. Even though debtor had conspicuously written the word "stock" on the front of the check, GEM's bookkeeper erroneously concluded that the check was partial payment of the shareholder loan because the bookkeeper was not aware at that time of the stock option agreement. Although the check disbursement ledger indicates that the check was intended as a partial payment of George Marker's shareholder loan account, no entry to that effect was ever posted to the shareholder loan account of George Marker. Were defendants' account of the purpose of the check to be believed, one would expect GEM's shareholder loan account ledger to contain such an entry.

Also, documents and records prepared and maintained by GEM indicate that GEM intended to purchase the shares of its capital stock which had been owned by George Marker when the above check was issued. As noted, GEM's balance sheets and tax returns for every fiscal year and every tax year subsequent to December 25, 1986 reflect the existence of treasury stock valued at $5,000.00. This sum is precisely the amount of the check issued to Beulah Marker on that date. There is no indication that GEM had purchased that amount of its capital stock at some other time and converted it to treasury stock.

Defendants' argument that GEM's purchasing of the stock in question was "ineffective"—i.e., was a nullity—for the reasons recited previously fares no better.

■ Their contention that it was a nullity because said purchase was not in accordance with the provisions in the stock option agreement in that GEM improperly exercised its option in the first year after George Marker's death is without merit. Without knowing the precise legal theory or utilizing esoteric wording, debtor and Richard Marker effectively assigned to GEM their right to exercise the option to purchase in the first year after George

Marker's death. In that way they could achieve their goal of maintaining equal ownership of GEM, utilize its funds rather than their own, and effectively prevent Beulah from challenging the will and claiming all or a portion of the stock. Moreover, the corporation, of which they had become the exclusive owners, secured the tax advantage of the purchase of treasury stock.

A legal assignment—as opposed to an equitable one—is the transfer or setting over of property or of some right or interest therein from one person to another. Unless qualified in some way, it is properly the transfer of an entire interest in an estate, chattel, or thing. *See In re Purman's Estate*, 358 Pa. 187, 190, 56 A.2d 86, 88 (1948). In order to effect a legal assignment, the assignor must have a present intent at the time of assignment to divest himself of his right. *See Melnick v. Pennsylvania Co. for Banking and Trusts*, 180 Pa.Super. 441, 443–44, 119 A.2d 825, 826 (1956). Lack of consideration need not render an assignment invalid. *See Ertel v. McCloskey*, 167 Pa.Super. 120, 123, 74 A.2d 652, 654 (1950).

Debtor and Richard Marker assigned to GEM their exclusive right to purchase George Marker's capital stock during the first year after his death. They intended, on December 24, 1986, to divest themselves of their exclusive right to purchase said stock during that interval of time in favor of GEM. As noted, the check in the amount of $5,000.00 *which debtor drafted* was drawn on an account in the name of GEM. Debtor, in so doing, knowingly and voluntarily divested his own right to exercise the option to purchase during the first year in favor of GEM. Defendants' argument as to non-assignability pursuant to § 13 of the Stock Option Agreement is also without merit, as it is axiomatic that all parties to an agreement have the absolute right to alter its terms.

Richard Marker's insistence that he was unaware of debtor's action and that he would not have consented had he known is unconvincing. Debtor and Richard Marker were the sole surviving officers, shareholders, and directors of GEM, a closely-held corporation. Moreover, the relationship between debtor and Richard Marker was and still is close. Each of them was aware of and consented to actions taken by the other with regard to GEM. It is not plausible that Richard Marker was unaware that debtor issued the check to Beulah Marker in order to purchase George Marker's stock on behalf of GEM. At no time did Richard Marker express his disagreement with what debtor had done. Not only was Richard Marker aware of debtor's action, he also tacitly consented thereto.

Defendants' contention that GEM's purchasing of the stock was a nullity because Beulah Marker lacked authority under Pennsylvania law to act on behalf of the estate and sell the stock on December 24, 1986 since letters testamentary had not yet been issued to her is also incorrect in light of the specific circumstances of this case.

In general, the executor of a decedent's estate has no rights or duties until letters testamentary have been issued. *See In re Brown's Estate*, 131 Pa.Super. 463, 467, 200 A. 940, 942 (1938). Actions taken by the executor prior to issuance of letters testamentary are invalid.

This legal principle, like so many others, has its exceptions. Issuance of letters testamentary to an executor can, in certain instances, *relate back* so as to *validate* actions involving the executor which occurred *prior* to issuance of letters testamentary. *See Becker v. Montgomery*, 305 Pa.Super. 582, 586, 451 A.2d 1029, 1031 (1982). For instance, they relate back so as to validate prior affirmative actions by the executor which are intended to preserve or to administer the estate. *See In re Purman's Estate*, 334 Pa. 238, 244, 5 A.2d 906, 909 (1939). Letters testamentary also relate back so as to validate prior actions in which the trustee's action is "merely passive". *See Beckman v. Owens*, 135 Pa.Super. 404, 407, 5 A.2d 626, 627 (1939) (citations omitted).

In addition to devising all of George Marker's shares of GEM capital stock to debtor and to Richard Marker in equal portions, the last will and testament of George Marker specifically appointed Beulah Marker executor of his estate.

The stock option agreement imposed no obligation upon the optionees—i.e., upon debtor or Richard Marker, or GEM—to exercise their option to purchase the stock in question. It did, however, impose certain obligations upon the estate of George Marker upon tender of the specified purchase price by the optionee.

An option is an offer which, when accepted by the optionee, becomes a valid and *binding* agreement. *See Phillips v. Tetzner*, 357 Pa. 43, 45, 53 A.2d 129, 131 (1947). The optionee, upon exercising the option, may become the owner of at least an *equitable* interest in property which is the subject of the option. *Id.*

The fact that GEM purchased the stock in question nearly three (3) years before letters testamentary were issued to Beulah Marker does *not* render that purchase invalid under the laws of Pennsylvania. Included among the obligations imposed upon Beulah Marker as the named executor of George Marker's estate was the obligation to receive and accept the purchase price specified in the stock option agreement upon its tender by the appropriate optionee. Such action on her part is "merely passive" and thus was validated by the subsequent issuance of letters testamentary on August 21, 1989. Accordingly, a *valid* sale of the stock to GEM by the estate of George Marker was consummated upon receipt of the purchase price tendered by GEM on December 24, 1986. ·

Active—as opposed to "merely passive"—conduct on the part of Beulah Marker concerning sale of the stock to GEM prior to issuance of letters testamentary may or may not have been valid. For example, actions by her to transfer said stock certificates to GEM with proper endorsement may or may not have been valid. There is no evidence, however, that any such active conduct occurred. This does not mean, however, that said purchase by GEM was a nullity and that GEM had no interest in the stock prior to issuance of letters testamentary. At a minimum, GEM was the *equitable* owner of the stock as of December 24, 1986, even if it did not have legal title thereto.

Defendants' contention that GEM's purchase of the stock was a nullity because it was not authorized by a resolution of its board of directors, as required by 15 Pa.S. § 1701A (Purdon's 1967), also must be rejected.

GEM's corporate records, which have always been under the exclusive control of debtor and Richard Marker, give no indication that such a purchase was formally authorized by a majority of its board of directors. However, the absence of any indication in the minutes of GEM's board of directors (or in any other written corporate record) that GEM's purchase of the stock was formally authorized by a resolution of a majority of its board of directors does *not* compel the conclusion that no such authorization was given. The above statute does not specify that such a "resolution" be in writing or that it be recorded in the minutes of the meetings of the board of directors.

Moreover, the same considerations cited previously in support of the inference that debtor and Richard Marker assigned to GEM their right to purchase the stock during the first year after George Marker's death also compel the conclusion that a majority of the board of directors also authorized it to purchase the stock. Debtor and Richard Marker were the sole surviving members of GEM's board of directors on December 24, 1986. The assignment to GEM of their right to purchase the stock during the first year also amounted to an authorization on their part to purchase the stock. Nothing more would be required under the circumstances of this case.

Even if it be assumed counterfactually that GEM's purchase of the stock was a nullity for any of the reasons set forth by the defendants, they will not be permitted to raise such matters in defense to the trustee's action against them.

Equity is a flexible concept which involves rejection of rigid rules to accomplish what is fair and just in a particular situation. *See State of Illinois by Illinois Dept. of Public Aid v. Heckler*, 616 F.Supp. 620, 672 (N.D.Ill.1985), *aff'd*, 808 F.2d 571 (7th Cir.1986). It would be unfair

and unjust to permit those who have profited from their own admittedly unlawful conduct to raise that unlawfulness as a defense to an action brought against them which is based on such conduct. Debtor and Richard Marker unquestionably benefitted from the purchase in that they effectively increased their percentage of ownership of outstanding shares of GEM's capital stock from 33.235% to 50% without expending any of their own personal funds. GEM's funds, not theirs, were used for that purpose.

It must be concluded, in light of the foregoing, that debtor was the owner of fifty percent (50%) of the capital stock of GEM when he filed a voluntary chapter 7 petition on May 17, 1991. Under the Business Corporation Law of Pennsylvania in effect at the time GEM purchased the stock, said shares were incapable of being voted or being counted for any reason relating to voting purposes. *See* 15 Pa.S. § 1508 (Purdon's 1967). Although the present Business Corporation Law no longer recognizes the existence of treasury stock, it provides that shares of a business corporation which are owned by the corporation and which are controlled by its directors are not to be counted in determining the total number of outstanding shares for voting purposes. *See* 15 Pa.S. § 1762(c) (Purdon's Supp.1992). The 228 shares purchased by GEM do not count in determining ownership of GEM. The only shares that matter for that purpose are debtor's 226 shares and Richard Marker's 226 shares.

#### B. *Debtor's "Disclaimer".*

The trustee also alleges, as an *alternative* theory of recovery, that debtor's purported "disclaimer" in reality was a "renunciation" under Pennsylvania law of his interest in the estate of George Marker. According to the trustee, said renunciation constitutes a transfer under Pennsylvania law which is avoidable as a fraudulent conveyance.

Defendants insist that the "disclaimer" is indeed a disclaimer, not a renunciation, and argue that debtor therefore *never* had an interest in the estate of George Marker that was subject to transfer, fraudulent or otherwise, by him.

It is not necessary for the court to address these issues. As noted, this theory is put forward as an *alternative* to the previous theory. If the trustee prevails under the first theory—as indeed he has—there is no need to address the second theory. It does not affect the outcome of this case whether said document constituted a disclaimer or was only a renunciation.

An appropriate order shall be issued.

### ORDER OF COURT

AND NOW at Pittsburgh this 22nd day of July, 1992, in accordance with the accompanying Memorandum Opinion, it is ORDERED, ADJUDGED and DECREED that judgment is entered in favor of plaintiff Alan E. Cech, Trustee, and against defendants Clyde W. Marker, Richard Marker, and George E. Marker & Sons, Inc. Defendant Clyde W. Marker was owner as of May 17, 1991, the date on which he filed a voluntary chapter 7 petition, of fifty percent (50%) of the outstanding shares of capital stock issued by defendant George E. Marker & Sons, Inc. Defendant Richard Marker owned the remaining fifty percent (50%) of the shares at that time.