[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 13-14979

_____

D.C. Docket No. 8:05-cv-01380-SCB-TGW

DONALD E. CARLSON,
SHEREE HARTING,
CHARLES HOUSE,
STEPHEN RENBERG,
TROY UPMAN,
each individually and on behalf of
all similarly situated individuals,

Plaintiffs – Appellants
Cross - Appellees,

versus

FEDEX GROUND PACKAGE SYSTEMS, INC.,

Defendant – Appellee
Cross - Appellant.

_____

Appeals from the United States District Court
for the Middle District of Florida

_____

(May 28, 2015)

Before ED CARNES, Chief Judge, JORDAN and ROSENBAUM, Circuit Judges.

JORDAN, Circuit Judge:

For customers who are regularly visited by the ubiquitous white trucks of FedEx Ground, with their familiar purple and green logos, the usual concern is whether packages are picked up on schedule and delivered on time. If asked, a good number of those customers would probably say that they believe (or reasonably assume) that the drivers of those white trucks are employed by FedEx. The law, however, sometimes has a funny way of making hard what would otherwise seem intuitively simple, and that is the case with the legal status of FedEx's drivers. The drivers who work for FedEx in Florida say they are employees, while FedEx maintains that they are independent contractors, and the resolution of that dispute is critical to a class action lawsuit filed by those Florida drivers against FedEx. Applying Florida law, we conclude that, on this record, the issue is one for a jury to resolve.

# I

Drivers who worked for FedEx in Florida filed suit in June of 2005, asserting a number of statutory and common-law claims against the company (statutory claims under Florida's Deceptive and Unfair Trade Practices Act, *see* FLA. STAT. §501.201 *et seq.*, and common-law claims for false information negligently supplied, breach of contract, and fraud). Between 2003 and 2009,

2

drivers in approximately 40 other states filed similar actions against FedEx. The Judicial Panel on Multidistrict Litigation consolidated these actions and transferred them to the Northern District of Indiana, which we will refer to as the MDL court. In these consolidated actions, the drivers alleged that, under their respective state laws, they were employees of FedEx and sought, among other things, reimbursement of business expenses and back pay for overtime. *See In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 758 F. Supp. 2d 638, 654 (N.D. Ind. 2010) (*In re FedEx II*).

The Florida drivers sought class certification in the MDL court, arguing that their status as employees would be demonstrated by the standard contract they executed with FedEx—the "Operating Agreement"—and internal policies, practices, and procedures distributed by FedEx to its officers and employees. The MDL court agreed with the drivers and certified a Florida class under Federal Rule of Civil Procedure 23(b)(3), finding that the common question regarding FedEx's right to control the work of its drivers predominated over other questions affecting members of the class. It determined that the extent of FedEx's control would depend on an analysis of the terms of the standard Operating Agreement, as well as standard practices and procedures of FedEx that were systematically applicable to all of the Florida drivers.

3

Following discovery, the Florida drivers filed a motion for summary judgment, asserting that they were FedEx's employees under Florida law. FedEx filed a cross-motion for summary judgment, arguing that the drivers were independent contractors. The MDL court, specifying that it was only considering "evidence common to the drivers' relationships with FedEx on a nationwide basis" (i.e,. the standard Operating Agreement and FedEx's standard practices and procedures), granted FedEx's motion for summary judgment and denied the drivers' motion. *Id.* at 655.

In granting FedEx's motion, the MDL court ruled that the drivers were independent contractors under Florida law because, under the Operating Agreement and FedEx's standard practices and procedures, FedEx did not have the right to control the manner, method, and means by which the drivers did their jobs. *See In re FedEx Ground Package Sys., Inc., Emp't Practices Litig.*, 734 F. Supp. 2d 557, 560-75 (N.D. Ind. 2010) (*In re FedEx I*) (setting out the provisions of the standard Operating Agreement and FedEx's standard practices and procedures in the course of analyzing similar claims by Kansas drivers); *In re FedEx II,* 758 F. Supp. at 676-78 (applying Florida law to those provisions, practices, and procedures). Incorporating its earlier decision in *In re FedEx I* concerning Kansas drivers, the MDL court concluded that "'the only reasonable inference that can be drawn [from the Operating Agreement and FedEx's standard practices and

4

procedures] is that FedEx hasn't retained the right to control the details of the [Florida drivers'] work methods on a class-wide basis.'  Whether the court looks only to the right to control, or to all the Restatement factors or some number of factors in-between, the result is the same." *In re FedEx II,* 758 F. Supp. 2d at 678 (quoting *In re FedEx I,* 734 F. Supp. 2d at 589).

The MDL court then remanded the case to the Middle District of Florida for resolution of individual common-law claims (false information negligently provided and breach of contract) asserted by plaintiffs Sheree Harting, Troy Upman, and David Mosher.  FedEx prevailed on these individual claims in the Middle District, and ultimately obtained a final judgment in its favor.  The Florida drivers now appeal.

## II

We review a district court's grant of summary judgment *de novo*, viewing the record and drawing all factual inferences in the light most favorable to the non-moving parties.  *See Mazzeo v. Color Resolutions Int'l, LLC*, 746 F.3d 1264, 1266 (11th Cir. 2014).  Summary judgment is appropriate when "there is no genuine dispute as to any material fact" and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  "[W]hether a genuine issue concerning a material fact exists is itself a question of law that must be decided by the court."

5

10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2720 (3d ed. 1998).

"If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (internal quotation marks and citations omitted). This is because "the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves v. Sanderson Plumbing Products, Inc.,* 530 U.S. 133, 150 (2000) (citation and internal quotation marks omitted). Here, as we explain, the underlying facts are largely undisputed, but the inferences that can be drawn from those facts are not.

## III

Everyone in this diversity case agrees that Florida substantive law governs. *See generally Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). In interpreting Florida law, we look first to precedent from the Florida Supreme Court. If there is no such precedent, we adhere to decisions of Florida's intermediate appellate courts absent some persuasive indication that the Florida Supreme Court "would decide the issue otherwise." *Winn-Dixie Stores, Inc. v. Dolgencorp, LLC*, 746 F.3d 1008, 1021 (11th Cir. 2014) (internal quotation marks omitted). *See Huron Holding Corp. v. Lincoln Mine Operating Co.,* 312 U.S. 183, 189 n.7 (1941).

6

**A**

The claims of the Florida drivers stand or fall on the common question of whether FedEx properly classified them as independent contractors.  In Florida, "[i]t is well-established that the question of an employer/employee relationship is generally a question of fact, and therefore a question for the trier of fact." *Pate v. Gilmore*, 647 So. 2d 235, 236 (Fla. 1st DCA 1994).  *Accord Villazon v. Prudential Health Care Plan, Inc.*, 843 So. 2d 842, 853 (Fla. 2003) ("The existence of an agency relationship is normally one for the trier of fact to decide.").  Nevertheless, this general default rule does not always apply, and Florida courts have not hesitated to grant summary judgment on the employee/independent contractor question when the circumstances warrant.  *See, e.g., Miami Herald Pub. Co. v. Kendall,* 88 So. 2d 276, 279 (Fla. 1956).

In determining whether an employment relationship exists, the Florida Supreme Court has long used the standard set forth in the Restatement (Second) of Agency.  *See Keith v. News & Sun Sentinel Co.*, 667 So. 2d 167, 172-73 (Fla. 1995); *Cantor v. Cochran*, 184 So. 2d 173, 174-75 (Fla. 1966); *Kendall*, 88 So. 2d at 278-79; *Magarian v. S. Fruit Distribs.*, 1 So. 2d 858, 860-61 (Fla. 1941).  Generally speaking, the Restatement provides that an employee is "a person employed to perform services in the affairs of another and who with respect to the

7

physical conduct in the performance of the services is subject to the other's control or right to control."  Restatement (Second) of Agency § 220(1) (1958).

The Restatement provides a list of 10 non-exclusive "matters of fact" that courts should consider in determining whether someone is an employee.  These factors, used by the Florida Supreme Court in *Cantor*, 184 So. 2d at 174-75, are as follows: (a) the extent of control which, by the parties' agreement, the employer exercises over the details of the work; (b) whether or not the one employed is engaged in a distinct occupation or business; (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; (d) the skills required in the particular occupation; (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work; (f) the length of time for which the person is employed; (g) the method of payment, whether by the time or by the job; (h) whether or not the work is part of the regular business of the employer; (i) whether or not the parties believe that they are creating the relation of master and servant; and (j) whether the principal is or is not a business.  *See* Restatement (Second) of Agency § 220(2).

According to the Florida Supreme Court, "courts should initially look to the agreement between the parties, if there is one, and honor that agreement, unless other provisions of the agreement, or the parties' actual practice, demonstrate that

8

this is not a valid indicator of status." *Keith,* 667 So. 2d at 171. *See also Florida Publ'g Co. v. Lourcey*, 193 So. 847, 847 (Fla. 1940) ("These provisions were ample to make Seig an independent contractor if they were not to all intents and purposes vitiated by other provisions of the contract or the practices of the parties under it."). Here the Operating Agreement states that FedEx's drivers will provide the services in question "strictly as . . . independent contractor[s], and not as . . . employees[s] of [FedEx] for any purpose," and further provides that "the manner and means of reaching the[ ] results [sought to be achieved] are within the discretion of the" drivers. *In re FedEx I,* 734 F. Supp. 2d at 560 (internal quotation marks omitted). Although this language is not determinative, *see In re FedEx II,* 758 F. Supp. 2d at 677 (citing Florida cases), it lends support to FedEx's argument that the Florida drivers are independent contractors, unless of course the other provisions of the Operating Agreement and FedEx's standard practices and procedures indicate that the Agreement's characterization of the drivers' status is not accurate.

With this framework in mind, we summarize relevant decisions from the Florida courts, and then discuss the facts that are relevant to the dispute between FedEx and its Florida drivers. In undertaking the analysis that follows, we are mindful of the Florida Supreme Court's admonition that a case like this one must be decided on its own facts in light of the totality of the circumstances. *See Keith*,

667 So. 2d at 169-71 (holding that court's prior decision did not create a presumption that a newspaper delivery person is an independent contractor because "the facts peculiar to each case govern the decision"); *Magarian*, 1 So. 2d at 861 ("[E]ach case must stand on its own facts and, therefore, no useful purpose may be served by citing particular cases involving different factual conditions."); *In re FedEx II,* 758 F. Supp. 2d at 677 ("Florida courts consistently point out that no bright-line rule exists for applying these principles, and each case must be determined on its own facts and in light of the totality of the circumstances.").

**B**

Consistent with § 220(1) of the Restatement, many Florida courts have recognized that the extent of control an employer exercises over the details of the job is a significant factor in determining whether the worker is an employee or independent contractor. *See, e.g., Keith*, 667 So. 2d at 171-72; *Del Pilar v. DHL Global Customer Solutions (USA), Inc.*, 993 So. 2d 142, 146 (Fla. 1st DCA 2008), *appeal dismissed,* 1 So. 3d 171 (Fla. 2008); *Harper ex rel. Daley v. Toler*, 884 So. 2d 1124, 1131 (Fla. 2d DCA 2004); *4139 Mgmt. Inc. v. Dep't of Labor and Emp't*, 763 So. 2d 514, 517 (Fla. 5th DCA 2000). "If [an individual] is merely subject to the control or direction of the owner as to the result to be obtained, he is an independent contractor; if he is subject to the control of the employer as to the means to be employed, he is [an employee and] not an independent contractor."

10

*Gulf Refining Co. v. Wilkinson*, 114 So. 503, 505 (Fla. 1927). In other words, "control directed towards *means* is necessarily more extensive than . . . control directed towards *results*." *Harper*, 884 So. 2d at 1131 (emphasis in original).

FedEx points to *Kendall,* 88 So. 2d at 278-79, a tort case in which the Florida Supreme Court reversed a jury verdict and held that a newspaper delivery person was an independent contractor, and not an employee, of the Miami Herald. *Id.* at 280. The contract between the parties provided that the newspaper delivery person was "a separate, independent contractor and not subject to the exercise of any control by [the Herald] over his *method of distributing or otherwise handling the delivery* of . . . newspaper within his territory other than as expressly set forth in [the] contract." *Id.* at 277 (emphasis in original). Finding that the terms of the agreement were obviously intended to make the delivery person an independent contractor, the Florida Supreme Court proceeded to determine whether the practice of the parties vitiated this intent and established that he was actually an employee. *Id.* at 278-79.

The evidence presented at trial showed that the delivery person was to begin his work at 4:30 a.m. and was to be done by 6:30 a.m. If he overslept, a Herald manager "would go to his home and rout him out of bed." *Id.* at 278. "The agent of the [Herald] apparently 'rode herd' on [the delivery persons] to see that deliveries were made to the subscribers and 'that everything was going all right.'"

*Id.* The delivery person was required to deliver the newspaper in an unwrinkled condition and, although he was not exactly instructed on how to fold the newspaper, "he was told he could not fold them in 'biscuits.'" *Id.* The contract further required the delivery person to handle the Miami Herald's newspaper exclusively and to select a substitute (in the event he was unable to make his deliveries) and be responsible for the substitute.

The Florida Supreme Court recognized that these facts demonstrated some supervision by representatives and agents of the Herald over the newspaper delivery persons. Nevertheless, it concluded that the Herald did not supervise the actual delivery of the papers. While the delivery person was doing his job, he was acting alone, "following his route, remembering the addresses of subscribers who were in good standing, and collecting and properly accounting for funds coming into his hands." *Id.* at 279. Moreover, the contract left entirely up to the delivery person "the method [he] was to employ in carrying the papers to the subscribers once he had received them from the Herald." *Id.* at 278. Thus, the Florida Supreme Court held that "the extra-contractual activities of the contract parties [did not] neutralize[ ] the provisions of the agreement which . . . were obviously intended to make [the newspaper deliverer] an independent contractor." *Id.* at 279. *See also Lourcey*, 193 So. at 847-48 (holding that agreement's description of newspaper distributor as independent contractor was not overcome by provisions

concerning termination, promotion of newspapers, free distribution of sample copies, and retention of subscriber lists from carrier).

But *Kendall* is not on all fours.  Like the delivery persons in *Kendall*, the Florida drivers here are allowed to hire replacement drivers, and they are responsible for ensuring that the replacement drivers conform fully to the applicable obligations undertaken by the drivers pursuant to the Operating Agreement.  Unlike the delivery persons in *Kendall*, however, replacement drivers hired by the Florida drivers must be approved by FedEx.  And in order for FedEx to approve a replacement driver, the potential replacement must be qualified pursuant to applicable federal, state, and municipal safety standards, as well as FedEx's Safe Driving Program, which sets minimum experience, age, licensure, driving record, criminal record, and drug-and-alcohol abuse requirements. The Safe Driving Program further requires a showing of satisfactory work history and mandates compliance with basic safety and maintenance requirements.

More importantly, and contrary to the situation in *Kendall,* the Operating Agreement does not leave entirely up to the Florida drivers the methods that they may employ in carrying their packages to FedEx's customers once they have received them from FedEx.  Unlike the delivery persons in *Kendall*, who could "select the conveyance which [they] would use to transport the papers from the point of origin to the subscribers' front porches," 88 So. 2d at 278, FedEx reserves

13

control over the type, configuration, and appearance of the driver's truck and the tools and instrumentalities used for package delivery, such as the FedEx scanner and recordkeeping methods.

Another favorable case for FedEx is *Keith*, 667 So. 2d at 168, a workers' compensation case involving a newspaper street vendor. The street vendor had been hurt in an accident while selling newspapers, and brought a workers' compensation claim against the newspaper. *Id.* The Florida Supreme Court, after reaffirming the *Kendall* framework, addressed the status of the street vendor, who worked for a delivery agent who had an agreement with the News & Sun Sentinel to sell its newspapers. *Id.* at 168-69.

The agreement between the delivery agent and the News & Sun Sentinel provided that the delivery agent was an independent contractor who was to deliver and sell newspapers in a specified territory. *Id.* The agent, in turn, employed about 50 street vendors—who agreed to sell newspapers at given intersections within the agent's territory—and was responsible for filing his own federal and state tax returns and making his social security contributions related to his sale of newspapers. *Id.* at 168. The agent obtained accident insurance from the News & Sun Sentinel for those vendors who elected to obtain such insurance, and the News & Sun Sentinel billed him for the insurance. The News & Sun Sentinel charged

the agent a net of 2 cents per paper, and the agent, after paying the vendors, made a net profit of 3 cents per paper. *Id.* at 168-69.

The Florida Supreme Court first explained that *Kendall* did not purport to set out any conclusive presumption as to the status of newspaper delivery persons. *Id.* at 171 (*"Kendall* remains viable as an important precedent, but it does not create a conclusive presumption that all newscarrier delivery persons are independent contractors."). Then, applying the *Kendall* framework, and emphasizing the importance of contractual language and the element of control, the Florida Supreme Court affirmed the two findings of the judge of compensation claims: that the delivery agent was an independent contractor of the News & Sun Sentinel; and that the street vendor, who worked for the agent, was not an employee of the News & Sun Sentinel. *Id.* at 172-74. The Florida Supreme Court found it significant that the delivery agent and the News & Sun Sentinel intended to create an independent contractor relationship, that the delivery agent controlled the manner and means of performing the agreement, and that there was "little or no evidence to suggest that the practice of the parties was inconsistent with [an independent contractor] relationship." *Id.* at 173.

Like *Kendall*, *Keith* is also not a perfect fit. For starters, in *Keith* there was no direct relationship between the street vendor and the newspaper; the News & Sun Sentinel contracted with a delivery agent, who in turned contracted with street

15

vendors.  That degree of separation makes *Keith* distinguishable, as here there is a direct contractual relationship between the Florida drivers and FedEx.  In addition, though the street vendor was selling the product of the News & Sun Sentinel, and not the product of the delivery agent who hired him, it was the delivery agent—and not the New & Sun Sentinel—who set the rules on how to sell the newspapers.

## C

On the other side of the ledger is *Justice v. Belford Trucking Co., Inc.*, 272 So. 2d 131 (Fla. 1972), a workers' compensation case which reached a different result than *Kendall* and *Keith*.  In *Justice*, the Florida Supreme Court reversed the decision of an administrative judge and held that a truck driver who worked for a trucking company was an employee of that company even though the parties' agreement provided that their relationship was intended to be that of "Carrier and Independent Contractor and not . . . employer-employee[,]" and even though either party could terminate the agreement without cause upon 30 days' written notice. *Id.* at 133.

The Florida Supreme Court initially noted that "[w]hile the obvious purpose to be accomplished by [the parties' contract] was to evince an independent contractor status, such status depends not on the statement of the parties but upon all the circumstances of their dealing with each other." *Id.* at 134.  Turning to the circumstances surrounding the parties' dealings, the Florida Supreme Court

16

explained that the truck driver was continuously subject to call or dispatch by the trucking company. *Id.* at 135. The trucking company called the driver once a week and left instructions as to where and when he was to pick up certain loads and make certain deliveries. *Id.* at 133. When the driver questioned an assignment, the trucking company threatened him with termination. *Id.* The truck driver remitted to the trucking company the gross earnings derived from freight charges. His compensation was then measured by a percentage of the freight charges collected by the company, with deductions for income tax, social security, and workmen's compensation. *Id.*

The driver also leased a trailer from the trucking company, which he used exclusively in service of the company, and the company required the truck driver to replace his original truck with another to pull the leased trailer because it determined that his truck was not sufficiently serviceable. *Id.* The company did not require, however, that the driver operate the truck himself, allowing him instead to hire other drivers to operate it if he so chose. *Id.* at 135. And, as noted, the truck driver was also subject to termination at the discretion of the trucking company.

On these facts, the Florida Supreme Court concluded that the truck driver was an employee of the trucking company, "under its direction and control as to all hauling trips, similar to any other truck driver employed by an interstate trucking

company." *Id.* at 136. The driver, though declared an independent contractor in the parties' contract, was in reality an employee. *Id.* at 135.

*Justice*, however, is also factually distinguishable on a number of fronts. Unlike the truck driver in *Justice*, the Florida drivers do not lease their trucks or any equipment from FedEx. *See* Operating Agreement at ¶ 7 ("Contractor shall not be required to purchase or rent any products, equipment, or services, from FedEx [ ] as a condition to entering into this Agreement."). The Florida drivers are also not required to use the trucks exclusively in the service of FedEx. Instead, they are permitted to use the trucks for other commercial or personal purposes when they are not in the service of FedEx, so long as all such identifying numbers, marks, logos and insignia are removed or masked when the truck is in such use. *See* Operating Agreement at ¶ 1.5. FedEx also does not make deductions from the Florida drivers' compensation for things like income taxes and social security contributions. It is also not clear whether the Florida drivers are subject to termination at the complete discretion of FedEx. *Compare id.* at ¶ 12.1(c) (allowing FedEx to terminate the Agreement if a driver "breaches or fails to perform the contractual obligations imposed by [the Agreement]"), *with id.* at ¶ 1.10(h) (requiring that drivers conduct all business activities "in a professional manner, and with proper decorum at all times").

**D**

To recap, in *Kendall, Keith* and *Justice* the relevant employment agreement characterized the person doing the work as an independent contractor, yet the cases came out differently. *Kendall* and *Keith* ruled that the delivery person and the street vendor were independent contractors, while *Justice* held that the truck driver was an employee. The cases are therefore a good composite illustration of the Florida Supreme Court's recognition that an employment agreement's language, though highly relevant, is not always determinative of employee/independent contractor status. Unfortunately, given their different facts and different results, *Kendall*, *Keith*, and *Justice* are ultimately not very helpful in figuring out the status of the Florida drivers here.

Fortunately, *Del Pilar*, 993 So. 2d at 144, a 2008 intermediate appellate decision in the context of the package delivery industry, gives us important guidance. *Del Pilar* concerned an accident between a motorcyclist and a van owned by a delivery company that had contracted with DHL—a company in the business of picking up, shipping, and delivering packages worldwide—to pick up and deliver all DHL packages in the Jacksonville area. *Id.* Because the motorcyclist, who alleged negligence on the part of the driver of the van, sought to recover from DHL on a theory of vicarious liability, a critical question was whether the delivery company was an employee of DHL (in which case vicarious

19

liability was possible) or an independent contractor (in which case vicarious liability could not exist). *Id.* The trial court granted summary judgment in favor of DHL, ruling that the delivery company which owned the van was an independent contractor for DHL. *Id.* at 144-45. The First District reversed, ruling that there was a genuine issue of material fact as to whether the company was an employee or independent contractor of DHL. *Id.* at 147-48.

The contract between DHL and the delivery company in *Del Pilar* characterized the company as an independent contractor and provided that "the manner and means" by which it performed its services was at its sole discretion and control. *Id.* at 147. But this "conclusory" contractual language, said the First District, "d[id] not conclude the matter" because "the balance" of the contract "le[ft] nothing to chance." *Id.* (citation and internal quotation marks omitted).

The DHL contract "recited an exhaustive and detailed list of procedures that [the delivery company's drivers] were to follow in processing, picking up, and delivering packages." *Id.* at 144. "[E]verything from the process of scanning packages into DHL's tracking system to procedures for redelivery after unsuccessful delivery attempts [was] set out in detail in the [contract]." *Id.* at 147. In addition, the delivery company's operational hub shared a location with DHL's facility, and DHL employees monitored and reviewed the delivery company operations on a daily basis. *Id.* at 145.

20

The delivery company's drivers were also required to wear DHL's uniform and the contract specified the particular articles of clothing and accessories considered part of the uniform, the purchase of which was funded by DHL. *Id.* The contract further required that the drivers properly display DHL's marks and uniforms in a clean, professional, and businesslike manner. *Id.* The delivery company was required to submit to unannounced operational inspections and audits at DHL's sole discretion and was required to maintain a fleet of delivery vans operated in DHL's livery, which was designed and placed on the vehicle in strict accordance with specifications established by DHL. *Id.* at 147. The delivery company, moreover, had to pick up and deliver packages at times requested by DHL's customers "pursuant to DHL's advertised guarantees." *Id.* Finally, either party had the power to terminate the contract in the event of a breach. *Id.* at 145.

The terms of the DHL contract, in the First District's view, were "susceptible of reasonably differing inferences as to the quantum of control reserved by DHL," and the trial court had therefore "erred in concluding, as a matter of law, that [the delivery company] was [DHL's] independent contractor. The question of DHL's control over [the delivery company's] operations," held the First District, "should go to the jury." *Id.* at 147.

21

**IV**

Here, as the MDL court pointed out, *see in re FedEx I*, 734 F. Supp. 2d at 588-601, several factors support the conclusion that the Florida drivers are independent contractors.

First, the Operating Agreement itself identifies the Florida drivers as independent contractors. *See In re FedEx I,* 734 F. Supp. 2d at 560. The Agreement further states that the "manner and means of reaching [the drivers' objectives under the Agreement] are within the discretion of" the drivers, *see id.*, and instructs that "no officer, agent or employee of FedEx [ ] shall have the authority to direct [the] [drivers] as to the manner or means employed to achieve such objectives and results." Operating Agreement at ¶ 1.15. As a result, the Florida drivers decide their hours of work, their routes, and other details of performance. *Id.*

Second, FedEx pays the Florida drivers on a "settlement" basis, which is based in part upon the number of packages and stops in a driver's service area. There are also a number of fixed and variable forms of payment to compensate Florida drivers for results achieved. *Id.* at ¶ 4.1 & Addendum 3. FedEx gives the Florida drivers 1099 Forms instead of W-2 forms, and does not withhold for income taxes, payroll taxes, social security taxes, health insurance, or other similar deductions. *See* Operating Agreement at ¶¶ 3.6, 4.2.

22

Third, the Florida drivers can sell part or all of their service areas with 30 days' notice to FedEx, or can acquire service areas from other drivers. *Id.* at ¶ 18. The drivers are responsible for all costs associated with the purchase, lease, and maintenance of their trucks. And they can, if they wish, hire employees and set the terms of their work. *Id.* at ¶ 2.2.

Like the First District in *Del Pilar,* however, we conclude that these contractual terms, though relevant and important, are not dispositive. Other provisions of the Operating Agreement, together with FedEx's standard practices and procedures, seem to "belie the creation of the status agreed to by the parties." *Keith*, 667 So. 2d at 171. As explained below, the Agreement and the standard practices and procedures provide "an exhaustive and detailed list of procedures that [FedEx drivers are] to follow in processing, picking up, and delivering packages." *Del Pilar*, 993 So. 2d at 144.

Take, for example, the means employed by the Florida drivers. Although the Operating Agreement states that the "selection and replacement" of the truck used by the driver is within the driver's discretion, this choice is not unfettered, and is subject to FedEx's determination of the suitability of the truck for the service called for. *See* Operating Agreement at ¶ 1.1. The Agreement additionally requires that trucks be maintained "in a clean and presentable fashion free of body damage and extraneous markings." *Id.* at ¶ 1.12. FedEx's internal procedures

23

further outline specific truck requirements, including height, length, bumper height, and cargo box size.  The Agreement does permit drivers to use additional vehicles on their routes, but once again this is only "with [the] consent of FedEx." *Id.* at ¶ 2.1.  And although the Agreement seems to indicate that drivers are not required to purchase a scanner, it also provides that certain bonuses are dependent on usage of a scanner for all pick-ups.  *See In re FedEx I*, 734 F. Supp. 2d at 568 (citing Operating Agreement at ¶ 1.10(d) and Addendum 6).

A similar level of control appears to exist with respect to the manner employed by the Florida drivers in processing, picking up, and delivering packages.  The Operating Agreement provides that drivers must "prepare daily driver logs and daily inspection reports, along with fuel receipts, and shipping documents."  *Id.* at ¶ 1.7.  The Agreement also requires that drivers "prepare and present for [ ] signature . . . such shipping documents as FedEx [ ] may from time to time designate, and to complete and return these documents to FedEx [ ] at the end of each business day."  *Id.*

Moreover, as part of their "Agreed Standard of Service," drivers also agree to "provide such electronic and/or manual data pertaining to package handling as is reasonably necessary to achieve [the goal of efficient pick-up, delivery, handling, loading and unloading of packages and equipment]."  *Id.* at ¶ 1.10(d).  The Operating Agreement outlines procedures the drivers must follow after

24

unsuccessful delivery attempts, and requires that they "handle, load, unload and transport packages using methods that are designed to avoid theft, loss and damage." *Id.* at    ¶ 1.11, 1.10(c).  FedEx's internal policies and procedures even include specific instructions suggesting how a driver's truck should be loaded: "The driver should load the van beginning with the last package to be delivered and finish with the first package to be delivered."

And, as in *Del Pilar*, the Operating Agreement here requires that "each person having contact with the public under the provisions of [the Agreement] . . . wear a FedEx[ ]-approved uniform, maintained in good condition, and [ ] otherwise keep his/her personal appearance consistent with reasonable standards of good order as maintained by competitors and promulgated from time to time by FedEx." *Id.* at ¶ 1.12.  Consistent with this language, Mr. Sullivan testified at his deposition that "terminal managers are expected to make sure that [ ] drivers are both in proper uniform and properly groomed before they go out to service FedEx customers." *In re FedEx I,* 734 F. Supp. 2d at 565.  He further testified that senior managers have the authority to tell drivers that they cannot service customers if they are not in proper uniform or properly groomed. *Id.*

In sum, there are facts that support FedEx's position and there are facts that support the Florida drivers' position.  Given the summary judgment posture of this case, we do not think it is appropriate for us to figure out what weight to give these

25

conflicting facts on the critical question of control under Florida law.  Nor do we believe it is our job to figure out which inferences should be drawn from the evidence.  *See Reeves*, 530 U.S. at 150.  After all, employee/independent contractor cases are necessarily fact-intensive, and the general rule in Florida is that whether a worker is an employee is usually a question of fact.  *See Villazon*, 843 So.2d at 853; *Pate*, 647 So. 2d at 236.

Factually speaking, *Del Pilar* is the closest Florida opinion we have, and we cannot say that the Florida Supreme Court would have decided that case differently.  Indeed, the Florida Supreme Court's decision in *Justice* (another truck driver case) provides support for the First District's decision in *Del Pilar*.  Although we recognize that *Del Pilar* is not binding in the Rule 56/summary judgment sense—because "federal law determines whether the evidence . . . suffices to entitle [a party] to summary judgment," *Bernard Schoninger Shopping Centers, Ltd. v.  J.P.S. Elastomerics, Corp.*, 102 F.3d 1173, 1177 (11th Cir. 1997)—it is nevertheless highly informative given that it involves the same package delivery industry and that Florida's summary judgment standard is very similar to that of Rule 56.  *See* Fla. R. Civ. P. 1.510 ("The judgment sought shall be rendered forthwith if the pleadings and summary judgment evidence on file show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.").

26

*Erie* and its progeny have opted for vertical uniformity in diversity cases, so that with respect to substantive law a case filed in federal court will be handled in the same way as it would be in the courts of the state where the federal court sits. *See, e.g., A.I. Trade Finance, Inc. v. Petra Int'l Banking Corp.*, 62 F.3d 1454, 1464 (D.C. Cir. 1995); *Witherow v. Firestone Tire & Rubber Co.*, 530 F.2d 160, 164 (3d Cir. 1976); John Hart Ely, *The Irrepressible Myth of Erie,* 87 HARV. L. REV. 693, 715 n.125 (1974). By ruling consistently with *Del Pilar*, we ensure that this case is decided in a Florida federal court as it would be in a Florida state court, and thereby discourage forum shopping as between federal and state courts in Florida and prevent the inequitable administration of the law. *See Hanna v. Plummer*, 380 U.S. 460, 467 (1965) ("The *Erie* rule is rooted in part in a realization that it would be unfair for the character of result of a litigation materially to differ because the suit had been brought in a federal court.").

To borrow language from a First Circuit case, "[t]he facts [here] closely parallel the facts in [*Del Pilar*]. On [its] authority we think the district court erred in granting [FedEx's] motion for summary judgment. That is to say, under [Florida] law as expounded in the cases to which we have referred the facts in the case before us present a genuine issue as to a material fact." *Schell v. Ford Motor Co.*, 270 F.2d 384, 387 (1st Cir. 1959). *Cf. Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467-68 (1940) (holding, post-*Erie*, that where a Kansas appellate court

27

had twice held—in related litigation between the same two parties—that evidence with respect to the issue of disability created a jury question, it was error for federal court to rule that insured was not disabled as a matter of law: "We are of the opinion that the Circuit Court of Appeals erred in failing to follow the two decisions of the Kansas City Court of Appeals in earlier suits between the same parties involving the same issues of law and fact.").

## V

Two of the Florida drivers, David Mosher and Sheree Harting, contend that the district court erred in granting summary judgment in favor of FedEx on their individual claims.  Mr. Mosher asserted five individual claims in the complaint— four breach of contract claims and one claim of false information negligently supplied; Ms. Harting asserted a total of six individual claims—three breach of contract claims and three claims of false information negligently supplied.

Mr. Mosher argues that the district court erroneously concluded that he lacked standing to pursue his claims and that Pennsylvania's four-year statute of limitations, and not Florida's five-year statute, governed his breach of contract claims.  But the district court provided additional alternative bases for granting summary judgment on four of Mr. Mosher's claims—ruling, for example, that Mr. Mosher did not suffer any damages from those alleged breaches—and Mr. Mosher has not challenged these alternative bases on appeal.

28

Ms. Harting similarly asserts that the district court erred in ruling that she lacked standing to pursue her claims. Much the same as with Mr. Mosher, however, the district court provided additional alternative bases for granting summary judgment on all of Ms. Harting's claims. The district court concluded that Ms. Harting failed to demonstrate that she suffered any damages from the alleged breaches and that some of the information provided by FedEx was true at the time it was given to her. Like Mr. Mosher, Ms. Harting fails to challenge these alternative bases on appeal.

"To obtain reversal on a district court judgment that is based on multiple, independent grounds, an appellant must convince us that every stated ground for the judgment against him is incorrect." *Sapuppo v. Allstate Floridian Ins. Co.*, 739 F.3d 678, 680 (11th Cir. 2014). Because Mr. Mosher and Ms. Harting have failed to challenge the other grounds upon which the district court based its grant of summary judgment to FedEx, they have abandoned any challenges to those grounds, and the district court's judgment must therefore be affirmed. *Id.*

On one of Mr. Mosher's breach of contract claims—the claim that FedEx violated the Operating Agreement by (1) reconfiguring the primary service area five times between 2002 and 2005, (2) failing to provide notice for each of the reconfigurations and the opportunity to retain the entire area, and (3) refusing to provide compensation for the reconfiguration—the district court granted summary

29

judgment solely on the ground that Mr. Mosher lacked standing. Specifically, the district court ruled that Mr. Mosher did not have standing to pursue this alleged breach because it occurred after he assigned his interest in the Operating Agreement to D. Mosher, Inc. in March of 2000. Mr. Mosher certainly challenges this ruling on appeal, so we address the merits of his argument.

Mr. Mosher contends that there was no enforceable assignment of his interests in the Operating Agreement because the purported assignment was not supported by consideration. Pennsylvania law governs Mr. Mosher's breach of contract claim under the choice of law provision in the Operating Agreement. *See* Operating Agreement at ¶ 16; *American Family Life Assur. Co. of Columbus, Ga. v. U.S. Fire Co.*, 885 F.2d 826, 830 (11th Cir. 2001) (forum state's choice of law rules determine which state's substantive law applies); *Maxcess, Inc. v. Lucent Techs, Inc.*, 433 F.3d 1337, 1341 (11th Cir. 2005) (contractual choice of law provisions are enforceable in Florida absent contravening public policy). Because the law governing a contract also governs matters concerning the assignment of contractual rights, *see Charles L. Bowman & Co. v. Erwin*, 468 F.2d 1293, 1295 (5th Cir. 1972), we turn to Pennsylvania law to determine whether Mr. Mosher effectively assigned away his interests in the Operating Agreement.

Under Pennsylvania law, "[l]ack of consideration need not render an assignment invalid." *In re Marker*, 142 B.R. 734, 741 (Bankr. W.D. Pa. 1992).

*See also Ertel v. McCloskey*, 74 A.2d 652, 654 (Pa. Super. 1950). Rather, an effective assignment requires only a party's present intent to divest himself of his rights, which may be expressed through a definitive act. *See, e.g., In re Marker*, 142 B.R. at 741; *Melnick v. Penn. Co. for Banking and Trusts*, 119 A.2d 825, 827 (Pa. Super. 1956). Thus, any lack of consideration for Mr. Mosher's assignment, standing alone, would not invalidate the assignment. We must assess whether, at the time of the assignment, Mr. Mosher demonstrated an intent to divest himself of his interests in the Operating Agreement.

We conclude that Mr. Mosher's intent to effect an assignment is clear. The record demonstrates that Mr. Mosher entered into a Signature Page Amendment with FedEx, which changed the identity of the contractor in the Operating Agreement to D. Mosher, Inc. From that point forward, FedEx made the payments due under the Operating Agreement to D. Mosher, Inc., and D. Mosher, Inc.'s tax returns reflected these payments. Finally, Mr. Mosher testified at his deposition that once he incorporated D. Mosher, Inc., the corporation became the contracting party under the Operating Agreement. On this record, we hold that Mr. Mosher's assignment of his interest in the Operating Agreement to D. Mosher, Inc. was valid.

Under Pennsylvania law, that means that Mr. Mosher lacked standing to bring his breach of contract claim. *See Sanford Inv. Co., Inc. v. Ahlstrom*

31

*Machinery Holdings, Inc.,* 198 F.3d 415, 420 (3d Cir. 1999) ("Under Pennsylvania law . . . a contracting party that has assigned its contractual rights to a third party does not have standing to enforce that contract."). We therefore affirm the district court's grant of summary judgment to FedEx on that claim.

## VI

We affirm the district court's grant of summary judgment in favor of FedEx on the individual claims of Mr. Mosher and Ms. Harting. We reverse the MDL court's grant of summary judgment in favor of FedEx on the Florida drivers' employment status. The Operating Agreement and FedEx's standard practices and procedures, and the inferences to be drawn from them, create a genuine issue of material fact as to whether the Florida drivers are employees or independent contractors. Because we have not relied on any individualized evidence in reaching our decision, we need not and do not reach FedEx's conditional cross-appeal, which sought reversal of the class certification ruling if our decision concerning the summary judgment ruling was based on individualized evidence.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**