**PERRIGO COMPANY, Sergeant's Pet Care Products, Inc., d/b/a Perrigo Animal Health; Velcera, Inc.; and Fidopharm, Inc., Plaintiffs,**

v.

**MERIAL LIMITED d/b/a Merial, L.L.C., Defendant.**

**CIVIL ACTION FILE NO. 1:15–CV–3674–SCJ**

United States District Court, N.D. Georgia, Atlanta Division.

Signed January 24, 2017

Kelly N. Pleas, Perrigo Animal Health, Omaha, NE, Mark Edward McGrath, Paul Garrity, Rena Andoh, Robert S. Friedman, Tyler E. Baker, Sheppard Mullin Richter & Hampton, New York, NY, Cody Sams Wigington, Michael Scott French, Wargo & French LLP, Atlanta, GA, for Plaintiffs.

Carrie S. Dolton, Michael T. Hilgers, Gober, Hilgers Law Firm, Omaha, NE, Frank Garrett Smith, III, Matthew Wolff Howell, Pamela Holland Council, Alston &

Bird, LLP, Atlanta, GA, John Patrick Elsevier, Jones Day, San Diego, CA, Judy Catherine Jarecki–Black, Merial Limited, Duluth, GA, Edward D. Tolley, Cook, Noell, Tolley & Bates, Athens, GA, for Defendant.

## ORDER

HONORABLE STEVE C. JONES, UNITED STATES DISTRICT JUDGE

Delousing household pets is big business. Over the years, Defendant Merial Ltd. has accordingly protected sales of its patented flea medicine from competitors via litigation and contractual agreements. Several of those agreements spawned the present dispute between Plaintiffs (Merial competitors) and Merial over whether and when Plaintiffs could sell competing flea products. Merial now moves for partial summary judgment (doc. 175),[1] arguing that Plaintiffs' breach of one such agreement precludes them from suffering damages for Merial's alleged breach of another.

## I. BACKGROUND

From the Court's previous Order granting Plaintiffs' motion to dismiss:

> Some years ago, Defendant Merial Limited (Merial) created a topical pet flea medicine—"Frontline Plus"—using a combination of two pesticides.[2] Frontline Plus products are covered by U.S. Patent No. 6,096,329 [ (329 Patent) ]. In 2010, Sergeant's Pet Care Products, Inc. (Sergeant's) filed a patent reexamination request challenging the 329 Patent's validity. Sergeant's lost in June 2011.

> In early 2011, after seeking reexamination but before that proceeding ended, Sergeant's began selling a generic version of Frontline Plus named FiproGard Plus. Sergeant's and Merial thereafter entered into an agreement (the "Sergeant's Agreement") that required Sergeant's to, among other things, cease selling any 329 Patent-infringing product if the reexamination resolved in Merial's favor. In return, Merial agreed not to sue Sergeant's for infringement. When Sergeant's lost on reexamination, the parties amended the Sergeant's Agreement [ (the "Sergeant's Amendment") ] to affirm that Sergeant's would not make or sell infringing products.

Perrigo Co. v. Merial Ltd., 215 F.Supp.3d 1329, 2016 WL 6106744, at *3 (N.D. Ga. Oct. 6, 2016) (record cites and quotes omitted, footnote added). Both the Sergeant's Agreement and the Sergeant's Amendment stated that they were "binding upon and for the benefit of the Parties ... and their respective Affiliates ... successors, devisees, and assigns." Doc. 176–7 at 6 (Sergeant's Amendment); see also doc. 176-6 at 5 (Sergeant's Agreement). They defined "affiliate" of a corporation or business entity as "any other corporation or business entity which controls ... that corporation or business entity." Doc. 176–6 at 3. "Control" in turn exists if the other company "owns, directly or indirectly, more than fifty percent" of such corporation or business entity. See id.

On September 12, 2012, plaintiff Perrigo Co. acquired Sergeant's via an asset purchase agreement. Doc. 181 at 24. Those assets[3] were then transferred to a wholly-

---

1. All citations are to the electronic docket, and all page numbers are those imprinted by the Court's docketing software.

2. Those two chemicals are fipronil and methoprene.

3. Among the assets purchased were "[a]ll rights to and under Contracts (including the Material Contracts)." Doc. 176–8 at 23. "Material Contracts" include "any written Contract for which the underlying term ... has not expired ... to which [Sergeant's] ... is a

owned Perrigo subsidiary, defendant Perrigo Animal Health. Id. at 25.

Plaintiff Velcera, Inc., like Sergeant's a Merial competitor, also butted heads with Merial over the 329 Patent. As with Sergeant's, Merial chose to enter into a settlement agreement with Velcera ("Velcera Agreement") to resolve their dispute. Doc. 176–9. In that agreement, Velcera promised to stop selling any product that infringed the 329 Patent from the date it executed the agreement (August 23, 2012) until, at the latest, November 30, 2014. Doc. 176–9 at 6. Merial in exchange promised (1) "not to sue" Velcera or its affiliates[4] for infringement of the 329 Patent after November 30, 2014, and (2) not grant "any Third Party a covenant not to sue ... or any other permission, right or license under[ ] the 329 Patent ... *except* as a direct result of a bona fide lawsuit in which the 329 Patent is placed in jeopardy due to" a credible challenge to its validity. Id. (emphasis in original). After November 30, 2014 (the "Covenant Expiration Date"), Velcera promised that it would pay Merial 8% of all sales of 329 Patent-infringing products until the patent expired. Id. at 7. Velcera and Merial agreed that the Velcera Agreement could "not be assigned, in whole or in part," except that Velcera could "assign all of [its] rights in [the] Agreement in connection with sale of all of substantially all of [its] assets relating to [its] flea and tick products ... and/or a merger or consolidation ... whether or not ... Velcera ... is the surviving entity." Id. at 9.

Six months later, in April 2013, Perrigo, after having purchased Sergeant's assets, merged with Velcera and became the sole "owner of all of Velcera assets, including flea and tick products." Doc. 181 at 26. Fast forward to mid–2014 and Perrigo "began making preparations to bring its [competing product] to market. Doc. 181–39 at 12. Pursuant to the Velcera Agreement—which contemplated a jointly agreed to press release that Velcera (now Perrigo) could confidentially provide to its customers (doc. 176–9 at 12)—Perrigo submitted a proposed statement to Merial for approval on June 20, 2014. Doc. 181 at 30; doc. 183–1 at 39. Some confusion with addresses ensued, and Perrigo did not receive Merial's response (addressed to legal counsel at "Sergeant's") until August 12, 2014. Doc. 183–1 at 41–42; doc. 181–4 at 58. In that letter, Merial affirmed that it "agreed after November 30, 2014 not to sue" Perrigo "and its Affiliates" for selling flea products that otherwise infringed the 329 Patent, and confirmed that Perrigo, by purchasing Velcera, "assumed Velcera's rights and obligations under the" Velcera Agreement. Doc. 181–4 at 58.

Three days later Merial's head of intellectual property, Dr. Judy Jarecki–Black, sent an email to Perrigo's legal counsel red-lining the proposed press release. Doc. 181–4 at 67. Jarecki–Black also expressed surprise that the statement declared that "Sergeant's Pet Care Products, Inc." intended to offer a flea product for sale. Id. She discussed the Sergeant's Agreement's prohibition on Sergeant's sales of 329–in-

---

party ... and which ... (c) obligates [Sergeant's] not to compete with any business or which restricts the right of [Sergeant's] to use or disclose any material information in its possession ... [or] (j) is a Contract under which [Sergeant's] is obligated to pay or has the right to receive a royalty, license fee, or similar payment." Id. at 15. Specifically excluded from the liabilities retained, however,

were "any royalty payments payable pursuant to the Merial Patent Infringement Settlement." Id. at 26.

4. "Affiliate" and "control" mean the same things in both the Velcera and Sergeant's Agreements. Compare doc. 176–9 at 2–3, with doc. 176–6 at 3.

fringing product and concluded by asking "why Sergeant's believes it can sell fipronil and methoprene products in view of its obligations under the [Sergeant's] Agreement." Id.

Merial and Perrigo nevertheless continued to negotiate over the terms of the press release. They eventually reached an agreement and Perrigo released the jointly agreed to statement to its customers on August 29, 2014. Doc. 183–1 at 52. Thereafter, Perrigo began hearing scuttlebutt from "customers and potential customers" that competitors were offering 329 Patent-infringing products, possibly in derogation of Perrrigo's notice rights under the Velcera Agreement (Merial agreed to notify Perrigo if it granted a license to another company). Doc. 181–4 at 9. Fearful that its position as the only Merial competitor able to sell a 329 copycat product (after November 30, 2014, of course) was being compromised, Perrigo sent Merial a letter on September 16, 2014 outlining its concerns and asking Merial to affirm that it had not offered a license to any third party. Doc. 181–4 at 86–87.

Merial responded on September 18, 2014, and affirmed (1) the November 30, 2014 "Covenant Expiration Date," (2) that it had not offered a license to a third party, and (3) that it had not settled 329–Patent litigation with another company. Doc. 181–4 at 90. It also, however, reiterated its "prior request ... that [Perrigo] explain to Merial the precise nature of the relationships between Velcera, Perrigo Company plc, Perrigo Animal Health, and Sergeants, and exactly what, if anything, each may be planning with regard to any rights and obligations under" the Sergeant's and Velcera Agreements. Id. In particular, Merial asked "whether Sergeants agrees that it and its Affiliates continue to be bound by the [Sergeant's] Agreement." Id. at 91.

Four days later, Perrigo thanked Merial for its affirmations, and informed it that Perrigo had no actual evidence that Merial planned to settle litigation with a third party by offering that company a 329 Patent license. Doc. 181–13. "In response to the remainder of [Merial's] letter," Perrigo stated that it "and its affiliates ... will offer for sale the following five [329 Patent] products from and after the Covenant Expiration Date, consistent with the acquisition of Velcera and Perrigo's rights in the [Velcera Agreement]." Id. Perrigo never outlined the Perrigo/Velcera/Sergeant's relationship beyond using the term "affiliates," nor did it answer Merial's questions about whether Sergeant's felt itself bound by the Sergeant's Agreement. Id.

In mid–November 2014, in satisfaction of its Velcera Agreement obligations, Perrigo paid Merial $2,000,000. The wire transfer reflects that the payment came from Sergeant's Pet Care Products, Inc.'s account and was designated "Velcera Settlement Payment." Doc. 181–20. Merial never objected to the payment. Finally, shortly after November 30, 2014, Perrigo, through the company it formed to hold Sergeant's assets (Perrigo Animal Health), began selling flea medicines under the brand names FiproGuard Plus and PetArmor Plus. Doc. 181 at 17; doc. 176–3 at 10.

Less than two weeks after Perrigo reentered the flea medicine marketplace, on December 12, 2014, it sued Merial for breach of the Velcera Agreement in the District of Nebraska. Doc. 1. Consistent with its customers' reports, Perrigo learned that Merial had granted a Perrigo competitor, Ceva Animal Health, a license to sell products addressed by the Sergeant's and Velcera Agreements. Doc. 1. Perrigo believed that violated Merial's Velcera Agreement covenant not to grant any such license.

Merial then filed suit against Perrigo in this Court (Merial v. Perrigo, No. 1:15–cv–13), alleging breach of the Sergeant's Agreement based on Perrigo's post–November 30, 2014 sales of flea medicine. Doc. 161. Ultimately, Perrigo's Nebraska case (now, Case No. 1:15–cv–3674) and Merial's Georgia complaint were consolidated before this Court. Doc. 160. Thereafter, Perrigo moved to dismiss Merial's complaint on personal jurisdiction grounds (doc. 164), while Merial filed the present motion for partial summary judgment on its claim that Perrigo breached the Sergeant's Agreement. Doc. 175.

Because the Court reached and granted Perrigo's personal jurisdiction motion first (doc. 185), Merial's complaint was dismissed before the Court considered its summary judgment motion. Put differently, none of the claims in 1:15–cv–13 that Merial seeks summary judgment on exist anymore. Nevertheless, the motion's theory of non-liability (for Merial) impacts Perrigo's claims in 1:15–cv–3674 because a finding that it violated the Sergeant's Agreement (i.e., that it was contractually prohibited from selling 329 Patent-infringing products) undermines its claimed damages for Merial's alleged violation of the Velcera Agreement. The Court therefore will address Merial's motion.

## II. GOVERNING STANDARD

Summary judgment is appropriate when the moving party establishes that, based upon the evidence presented, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he requirement that a dispute be 'genuine' means simply that there must be more than some metaphysical doubt as to the material facts." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 261, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations and internal quota-

tion marks omitted). The court views the record and draws all factual inferences in the light most favorable to the non-movant[, in this case, MVG]. Carlson v. FedEx Ground Package Sys., Inc., 787 F.3d 1313, 1317 (11th Cir. 2015). "If reasonable minds could differ on the inferences arising from undisputed facts, then a court should deny summary judgment." Id. at 1318 (quoting Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997)).

Dean–Mitchell v. Reese, 837 F.3d 1107, 1111–12 (11th Cir. 2016).

## III. ANALYSIS

"Merial seeks a partial summary judgment that" (1) under the terms of Perrigo's asset purchase agreement with Sergeant's, "Perrigo assumed Sergeant's rights and obligations in the Sergeant's Agreement," (2) Perrigo is "in breach of the Sergeant's Agreement for 'making, using, selling, and offering for sale in the United States" a firpronil and methoprene flea medicine "while the 329 Patent is in effect," and (3) Perrigo thus "cannot claim damages for lost sales" of such flea medicines. Doc. 176–2 at 16–17.

Perrigo, by contrast, insists that the Velcera Agreement superseded the Sergeant's Agreement upon which Merial's motion entirely relies. Doc. 181–39 at 17. Both contracts, says Perrigo, involve the same subject matter. Id. at 20. And because they grant Perrigo inconsistent rights, the newer Velcera Agreement controls. Id. Even if they did not, says Perrigo, Merial waived its rights under the Sergeant's Agreement by, among other things, accepting payments and royalties pursuant to the Velcera Agreement. Id. at 24.

This case entirely revolves around interpretation of contracts: the Sergeant's–

Perrigo Asset Purchase Agreement, the Sergeant's Agreement (including the Sergeant's Amendment), and the Velcera Agreement. The latter two require applying Georgia interpretive law (see doc. 176-6 at 6; doc. 176-9 at 10), while the Asset Purchase Agreement contains a Texas choice-of-law provision. Doc. 176-8 at 76.

**■** In Texas,

[w]hen interpreting a contract, [the] primary concern is to ascertain and give effect to the written expression of the parties' intent. Italian Cowboy Partners, Ltd. v. Prudential Ins. Co. of Am., 341 S.W.3d 323, 333 (Tex. 2011) (citing J.M. Davidson, Inc. v. Webster, 128 S.W.3d 223, 229 (Tex. 2003)). By this approach, [courts] "strive to honor the parties' agreement and not remake their contract by reading additional provisions into it." Gilbert Tex. Constr., L.P. v. Underwriters at Lloyd's London, 327 S.W.3d 118, 126 (Tex. 2010). The parties' intent is governed by what is written in the contract, not by what one side contends they intended but failed to say. Id. at 127. "[I]t is objective, not subjective, intent that controls." Matagorda Cty. Hosp. Dist. v. Burwell, 189 S.W.3d 738, 740 (Tex. 2006) (per curiam). [Courts] therefore give terms their plain and ordinary meaning unless the contract indicates that the parties intended a different meaning. Dynegy Midstream Servs., Ltd. P'ship. v. Apache Corp., 294 S.W.3d 164, 168 (Tex. 2009). We examine the writing as a whole to harmonize and give effect to all of the contract's provisions so that none is rendered meaningless or surplusage. J.M. Davidson, 128 S.W.3d at 229; Coker v. Coker, 650 S.W.2d 391, 393–94 (Tex. 1983).

Tex–Fin, Inc. v. Ducharne, 492 S.W.3d 430, 440 (Tex. App. 2016).

**■** Georgia operates similarly.

The cardinal rule of construction is to ascertain the intent of the parties. Where the contract terms are clear and unambiguous, the court will look to that alone to find the true intent of the parties. To determine the intent of the parties, all the contract terms must be considered together in arriving at the construction of any part, and a construction upholding the contract in whole and every part is preferred. When the language employed by the parties in their contract is plain, unambiguous, and capable of only one reasonable interpretation[,] the language used must be afforded its literal meaning and plain ordinary words given their usual significance.... An ambiguity is defined as duplicity, indistinctness, an uncertainty of meaning or expression used in a written instrument, and also signifies of doubtful or uncertain nature; wanting clearness or definiteness; difficult to comprehend or distinguish; of doubtful purport; open to various interpretations. Where ambiguities exist, the court may look outside the written terms of the contract and consider all the surrounding circumstances to determine the parties' intent. Parol evidence may not be considered unless the written instrument is ambiguous.

Greenberg Farrow Architecture, Inc. v. JMLS 1422, LLC, 339 Ga.App. 325, 791 S.E.2d 635, 639 (2016) (quoting Mun. Elec. Auth. v. Gold–Arrow Farms, Inc., 276 Ga. App. 862, 866–67, 625 S.E.2d 57 (2005)), reconsideration denied (Nov. 4, 2016).

With those interpretive requirements in mind, the Court begins its analysis in 2011, with the Sergeant's Agreement.

In that contract, as noted above, "Sergeant's and its Affiliates" promised to "refrain from any further making, using, selling, or offering for sale" all 329 Patent-

infringing products "so long as the 329 patent remains in effect." Doc. 176–7 at 5. "Affiliates" is defined as "any other corporation or business entity which controls ... that corporation or business entity," and "control" exists if the other company "owns, directly or indirectly, more than fifty percent" of such corporation or business entity. Doc. 176–6 at 3. In exchange for Sergeant's promise not to sell infringing product, Merial promised not to sue for infringement based on sales and production that occurred prior to a certain date (defined as the "Lawsuit Filing Deferral Period"). Id. at 4–5. In sum, Sergeant's promised that neither it nor any company that owns Sergeant's would sell 329 Patent infringing flea medicine until the patent expired (that occurred on August 3, 2016).

Enter Perrigo. When it purchased Sergeant's assets, Perrigo assumed all of Sergeant's rights under "Material Contracts," which include agreements, like the Sergeant's Agreement, that prohibit Sergeant's from competing with another business, or require it to pay royalties. Doc. 176–8 at 15. Indeed, the Asset Purchase Agreement specifically recognizes the Sergeant's Agreement, though only to make clear that Perrigo was *not* responsible for royalty payments it obligated Sergeant's to make to Merial. Id. at 26.

In other words, by purchasing Sergeant's assets, Perrigo stepped into Sergeant's shoes for purposes of the Sergeant's Agreement. Cf. Bomani v. All Persons Known Or Unknown Who Claim or Might Claim Adversely to Plaintiffs Title to Real Prop. Known as 7217 Lake Crossing, Stone Mountain, No. 1:12–CV–02637–JEC, 2013 WL 5423435, at *3 (N.D. Ga. Sept. 26, 2013) ("The corporation that survives a merger is entitled to step into the shoes of its predecessor to enforce that party's contractual rights."). That meant that Perrigo assumed Ser-

geant's obligation not to sell 329 infringing product until the patent expired. And *that* meant that the Sergeant's Agreement likewise obligated Perrigo "affiliates" to not sell such product. See doc. 176–6 at 3 ("Affiliate" includes companies that own more than 50% of Sergeant's).

About a year later, Merial and Velcera executed the Velcera Agreement. Velcera promised that it and its affiliates (same definition as in the Sergeant's Agreement) would not sell infringing product from August 23, 2012 to November 30, 2014. Doc. 176–9 at 6. Merial in turn promised not to sue Velcera (or its affiliates) for infringement after November 30, 2014. Id. Nowhere in the Velcera Agreement did Merial affirmatively acquiesce to Velcera or its affiliates selling infringing product.

But—and this is a big but—the Velcera Agreement unambiguously contemplated that Velcera and its affiliates would in fact sell infringing product after November 30, 2014. The agreement includes detailed provisions requiring Velcera to pay Merial a percentage of all "future Net Sales of [infringing product] until all claims of the 329 Patent infringed by the particular marketed [p]roduct have been permanently abandoned, expired, or declared invalid." Doc. 176–9 at 7. It also requires that Merial give Velcera notice if another company receives a license to sell patented flea medicine. Neither provision would exist if Velcera contracted only for a reprieve from Merial's threatened lawsuit, and not also a right to sell 329 Patent infringing product.

Although Velcera and Perrigo merged instead of Perrigo purchasing assets, the net effect was the same—Perrigo stepped into Velcera's shoes for purposes of the Velcera Agreement, just as it had with Sergeant's and the Sergeant's Agreement. See doc. 176–9 at 9 (prohibiting assignments *except* that Velcera could assign its

rights under the Velcera Agreement "in connection with ... a merger ... whether or not [Velcera] is the surviving entity"); Bomani, 2013 WL 5423435, at *3. Consequently, Perrigo and its affiliates were bound to not sell 329 Patent infringing product until November 30, 2014. Thereafter, Merial could not sue Perrigo, or its affiliates, for infringement, and Perrigo (and its affiliates) had to pay Merial an 8% royalty for all sales of infringing product made after November 30, 2014.[5]

Perrigo's purchase of both Sergeant's and Velcera—neither of which the parties to either agreement contemplated when they negotiated and executed the contracts—started the parties down the unusually tortured path that led to where this case sits today. After the Velcera purchase, Perrigo and its affiliates had, simultaneously, the obligation to not sell 329 Patent infringing product until the patent expired (pursuant to the Sergeant's Agreement), and the obligation to not sell that product *until* November 30, 2014, at which point they would have to pay an 8% royalty for any sales (pursuant to the Velcera Agreement).

If the Velcera Agreement did not exist, or if Perrigo had never purchased Velcera, Perrigo's post–November 30, 2014 sales of infringing product likely would violate the Sergeant's Agreement. Perrigo stepped into Sergeant's shoes for purposes of that contract when it purchased Sergeant's and so assumed its obligation not to sell infringing product. But Perrigo *did* buy Velcera, and the Velcera Agreement *does* exist.

Merial insists that contract does not "grant an affirmative right to sell products," and thus that it and the Sergeant's Agreement do not conflict. Doc. 183 at 8.

That, however, is the quintessence of form over substance. An obligation to not sell *until* a certain date—at which point sales will trigger royalty costs but not infringement liability (because of Merial's promise not to sue)—is nothing more than an implied license to sell *after* that date. The Court need look no further than the Velcera Agreement to confirm that understanding.

The inclusion of royalty provisions underscores that Merial and Velcera fully anticipated that Velcera (now Perrigo) would begin selling infringing product after November 30, 2014. So, too, do the provisions that require Merial to give Velcera notice if it grants a license to sell to a third party. If Velcera had no right to sell infringing product, it would not care what other companies could or could not do. That the Sergeant's Agreement lacks such a notice provision reinforces the reasonable inference drawn from its inclusion in the Velcera Agreement.

Implicit rights nested silently within explicit prohibitions (like the "no sales until" promise Velcera made) and prohibitions hiding within grants of power have a long history. The United States Constitution's Commerce Clause provides the clearest, and oldest, example. That provision grants Congress the power to regulate interstate commerce. The clause's terms, however, contain no language addressing the states' role in the matter. Despite that silence, the Supreme Court has long read the Commerce Clause to contain a "negative implication," namely, that states may not enact laws that "benefit in-state economic interests by burdening out-of-state competitors." Dep't of Revenue of Ky. v. Davis, 553 U.S. 328, 338, 128 S.Ct. 1801, 170

---

**5.** Merial did not, however, have an obligation to hold its fire on, say, breach of contract claims.

L.Ed.2d 685 (2008); cf. Gibbons v. Ogden, 9 Wheat. 1, 209, 6 L.Ed. 23 (1824) (Marshall, C.J.).

Reading the Velcera Agreement to contain a right to sell after November 30, 2014 is analytically no different. In fact, it's less of a leap because, as discussed above, the Velcera Agreement contains additional provisions that confirm the existence of that right.

After Perrigo's Velcera purchase, then, Perrigo and its affiliates possessed both the obligation to not sell infringing product (per the Sergeant's agreement), and the right to sell that product after November 30, 2014 (per the Velcera Agreement). No party to either contract contemplated that Perrigo would swoop in and by purchasing two companies create that situation. Neither agreement contemplated the other, nothing in the record indicates that Sergeant's and Velcera contemplated the other when contracting with Merial, and Merial certainly did not anticipate Sergeant's selling infringing product via its ownership by a non-party.

That unanticipated and, in Merial's eyes, undesirable outcome though violates no law. In fact, this case highlights precisely how markets should operate. Perrigo purchased assets it wanted on an open market. Among them was an obligation to not sell a product. Apparently it wanted to sell that product. Rather than breach the Sergeant's Agreement outright, Perrigo purchased the right it wanted (to sell 329 Patent infringing flea medicine).

That it did so by snapping up another company who itself held the right Perrigo wanted instead of bargaining directly with Merial does not undermine Perrigo's newly purchased right. Indeed, we as a society and economy *want* highly fungible rights and obligations.

Still, the Sergeant's Agreement did not disappear when Perrigo merged with Velcera. What happens to Perrigo's obligation under that contract is the real crux of this case. Perrigo invokes the "last in time" rule to argue that the Velcera Agreement's right supersedes the Sergeant's Agreement's obligation. Doc. 181–39 at 20.

Merial insists that that rule only applies where the "*same* parties subsequently execute another agreement on the *same* subject matter." Doc. 183 at 13 (emphasis in original). Because the two contracts here involved different parties at the times they were executed, says Merial, the later in time agreement cannot supersede the earlier. Id. at 14; see also id. at 15 ("Since Sergeant's was not a signatory to the [Velcera Agreement], the [Velcera Agreement] could not have operated as an amendment to the Sergeant's Agreement, as Perrigo contends.").

None of the "last in time" cases the parties cite are on all fours with this action. In Decca Records, Inc. v. Republic Recording Co., Del Wood, a recording artist, signed a contract with Tennessee Records. 235 F.2d 360, 361 (6th Cir. 1956). Republic Recording Co. later purchased Tennessee's rights under that contract. Id. ("Having secured, by assignment, Tennessee's contract, appellee occupied the same position toward Del Wood as had Tennessee, and had the same rights."). Republic then signed Del Wood to a new contract that, like her contract with Tennessee, covered "the exclusive right to her services." Id. at 363. Faced with some terms in the latter that conflicted with the former, the court held that the latter contract controlled. Id.

Here, by contrast, instead of stepping into Sergeant's shoes just before executing a new contract with Merial (or Velcera's shoes just before executing another new

contract with Merial), as would be necessary to align with <u>Decca Records</u>, Perrigo stepped into the shoes of two different companies who had two different contracts (entered into at different times) with Merial. In other words, Perrigo never entered into a new agreement with Merial at the same time as it wore Velcera or Sergeant's shoes. Even farther afield are cases like <u>Erler v. Graham Packaging Co.</u>, No. 4:14–cv–981, 2015 WL 4723681 (E.D. Mo. Aug, 10, 2015), where the parties to contract one and contract two are the same (no assignments to muddy the waters).

Underlying the "last in time" rule applied in <u>Decca Records</u> is the idea that two parties who execute a second contract covering a given subject matter do so having knowledge of the first. If terms in the second conflict with the first, courts assume that the parties intended the difference and thus intended that the newer term control.

Those assumptions and principles do not apply in this case. Velcera was not a party to the Sergeant's Agreement at the time it was executed. Perrigo wasn't a party to either that contract or the Velcera Agreement when either was executed. Hence, neither Velcera, Sergeant's, nor Merial could have intended the Velcera Agreement's sales allowance provision to supersede the Sergeant's Agreement's prohibition.

Nevertheless, it remains the case that Perrigo purchased the right to sell 329 Patent infringing flea medicine after November 30, 2014 when it merged with Velcera. It acquired that right after it acquired the obligation to not sell infringing product when it purchased Sergeant's assets. It stands to reason, then, that Perrigo intended its rights under the Velcera Agreement to supersede the obligations imposed by the Sergeant's Agreement.

If the Court sides with Merial and holds that Perrigo's sales of infringing product breached the Sergeant's Agreement, it would in a very real sense erase for Perrigo a piece of the Velcera merger (damages for Merial's alleged breach of the Velcera Agreement). That's an acceptable outcome in certain situations (fraudulently procured contractual benefits, illusory contracts, breaches, etc.). But where a party acts in accordance with its contractual obligations, to vitiate its contractual rights based on little more than bad timing cannot be the correct answer. To vitiate them when the party's contractual partner (Merial) got the benefit of its bargain (over $10,000,000 in royalty payments) is undeniably wrong.

Under the particular factual circumstances of this case, then, the proper rule must be that when a company or person steps into the shoes of different parties (i.e., occupies the same position vis-a-vis the other party, and has the same rights as the original party) to two contracts at different times, the terms (and rights and obligations) of the later contract control in the event they conflict with a term or terms of the earlier agreement. To hold otherwise would elevate form over substance and unnecessarily restrict the stream of commerce.

Merial could have negotiated for a provision in the Velcera Agreement that prohibited *all* assignments of rights, with no exception for mergers. Under such a contract, Perrigo's merger with Velcera would not have given it the ability to sell 329 Patent infringing product. But Merial did not. The limited assignment exception the Velcera Agreement in fact contained created—because the right to sell under the Velcera Agreement flowed to Perrigo *and* its affiliates, including Sergeant's—the opening for Perrigo to legally circumvent the Sergeant's Agreement's sales ban. No

genuine factual dispute calls that conclusion into question.[6]

## IV. CONCLUSION

Accordingly, Merial's partial motion for summary judgment is **DENIED**. Doc. 175. The parties' motions to seal (docs. 182 & 184) are **GRANTED**. The parties are directed to submit a status report and proposed scheduling order within twenty-one days of the date this Order is filed.

**SO ORDERED** this 24th day of January 2017.

---

6. Because the Court finds that Perrigo did not breach the Sergeant's Agreement, it need not decide whether Merial waived its rights under the contract by accepting royalty payments from Perrigo under the Velcera Agreement. Regardless, the Court notes that waiver is a fact intensive inquiry and here facts support both parties' positions. Acceptance of royalty payments, particularly since the wire transfers came from Sergeant's, suggest that Merial knew or should have known that Sergeant's, as a Perrigo affiliate, was involved in Perrigo's product sales. On the other hand, Merial consistently asserted that the Sergeant's Agreement prohibited Sergeant's from selling infringing product. Under the circumstances, the Court likely could not say that no genuine factual dispute exists such that summary judgment on waiver is appropriate.