**NOT RECOMMENDED FOR PUBLICATION**
File Name: 20a0162n.06

**No. 19-1133**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| MERIAL, INC., | ) | |
| | ) | |
| Plaintiff-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| SERGEANT'S PET CARE PRODUCTS, INC., | ) | COURT FOR THE WESTERN |
| | ) | DISTRICT OF MICHIGAN |
| Defendant-Appellee. | ) | |
| | ) | |

**FILED**
Mar 18, 2020
DEBORAH S. HUNT, Clerk

BEFORE:     BOGGS, BATCHELDER, and DONALD, Circuit Judges.

BOGGS, Circuit Judge. Merial, the maker of the popular Frontline Plus flea control product for pets, had been fighting for years with two competitors (Sergeant's and Velcera) who, it alleged, were infringing on its patent for that product. Just when the parties seemed to have resolved their disputes through a series of contracts, market forces threw everything into chaos: Merial's two competitors merged with or were bought by a third (Perrigo), bringing their contractual obligations under one roof. Since one agreement functioned as a license to manufacture a generic version of Frontline Plus, and the other as a prohibition on doing so, this created problems. Problems become lawsuits. This lawsuit came to the Northern District of Georgia, where a judge ruled in favor of Perrigo, holding (in relevant part) that it had a right to produce the generic version of Frontline Plus.

When Merial then pursued an action against only Sergeant's (now a Perrigo subsidiary) in Michigan, the U.S. District Court for the Western District of Michigan dismissed the new suit

on the grounds of collateral estoppel, citing the Georgia ruling. But it is far from clear that the Georgia ruling should be preclusive. Its language is tangled and (as to the question before us) contradictory. Moreover, Sergeant's is a corporate entity distinct from Perrigo, and a ruling as to Sergeant's liability does not appear to have been necessary to the Georgia decision. Therefore, though the question is a close one, we reverse.

## I.  FACTUAL AND PROCEDURAL HISTORY

In the beginning, Merial, a French animal-health company, developed and patented a flea-and-tick medicine for dogs and cats known as "Frontline Plus." Frontline Plus was covered by U.S. Patent No. 6,096,329 (the "'329 Patent"), which was granted in 2000 and ran until August 2016. *See ibid.* However, this popular product soon drew competitors, not to say imitators. In 2010, Sergeant's Pet Care Products filed a request for reexamination with the U.S. Patent and Trademark Office ("U.S.P.T.O") and, in early 2011 while that request was pending, began selling a competing "combination product" (a generic term for Frontline Plus and its competitors, which work through a combination of the pesticides fipronil and methoprene.)

In April 2011, Sergeant's and Merial resolved their dispute in what became known as the "Sergeant's Agreement," under which Sergeant's undertook to refrain from selling combination products during the life of the '329 Patent if the U.S.P.T.O. found in Merial's favor—which it subsequently did.

Meanwhile, in 2012, Merial entered into another agreement with a different competitor, Velcera, who was also making a combination product. The terms of the "Velcera Agreement" (also referred to in the multiple lawsuits to come as the "Master Settlement Agreement" or "MSA") were different from those of the Sergeant's Agreement: the Velcera Agreement was in essence a license to sell the knock-off Frontline after 2014 in exchange for royalty payments and certain

protections. Specifically, Velcera agreed not to sell infringing combination products until November 30, 2014, after which it could do so in exchange for a royalty payment to Merial of 8% of all sales until the '329 Patent expired. To protect its newly-acquired license, Velcera also obtained a promise from Merial that Merial would not grant a license, covenant not to sue, or permission to infringe the patent to any other competitor, and that Merial would notify Velcera if it in fact did so.

However, disturbances were ahead for this well-settled universe. On September 12, 2012, a drug company named Perrigo acquired Sergeant's through an asset-purchase agreement. On September 14, 2012, Perrigo incorporated a new, wholly-owned subsidiary, Perrigo Animal Health, and thereafter transferred Sergeant's assets to the subsidiary, which also resumed using the name Sergeant's. Then, in April 2013, Perrigo merged with Velcera "and became the sole owner of all Velcera assets, including flea and tick products." *Perrigo Co. v. Merial, Ltd.*, 267 F. Supp. 3d 1364, 1367 (N.D. Ga. 2017) (cleaned up). Now, the counterparties to the Sergeant's Agreement and the Velcera Agreement were under one corporate roof.

Trouble sprang up quickly from both directions. As Perrigo began preparing to release an infringing product pursuant to the Velcera Agreement, it became clear to Merial—with whom Perrigo was obligated to negotiate a mutually acceptable press release—that Perrigo was taking the position that, due to the Velcera Agreement, it could also produce and release infringing products through Sergeant's. Meanwhile, Perrigo heard rumors through industry channels that Merial had granted a license to an unrelated animal-products company, Ceva Animal Health, without notifying Perrigo. *See* 267 F. Supp. 3d at 1368. Interactions produced little but falsehoods (Merial reassured Perrigo that it had not issued another license) and evasions (Perrigo sidestepped Merial's inquiries about whether it would be putting out infringing products through Sergeant's).

Shortly after November 30, 2014, Perrigo released FiproGuard Plus and PetArmor Plus—which were infringing products—through Sergeant's. Around the same time, Perrigo was able to confirm the rumors: Merial had in fact granted a license to Ceva.

On December 12, 2014, Perrigo, Sergeant's, Velcera, and FidoPharm (a subsidiary of Velcera) sued Merial in the District of Nebraska, alleging breach of the Velcera Agreement. *Id.* at 1369; *see* Dkt. 1, *Perrigo Co. v. Merial Ltd.*, No. 8:14-cv-00403 (D. Neb.) [hereinafter "D. Neb. Dkt."]. Two weeks later, Merial sued Perrigo and the other three companies in the Northern District of Georgia, alleging breach of the Sergeant's Agreement. Merial moved in Nebraska to dismiss the case or, in the alternative, to transfer it to Georgia. The judge denied the first motion and held further arguments on the second. In October 2015, the District of Nebraska granted the motion to transfer the case to the Northern District of Georgia, citing judicial economy. *See* D. Neb. Dkt. 114. Once both cases were in Georgia, Merial moved to consolidate, which the court granted. Then the trouble started. Merial filed for partial summary judgment in the case in which it was the plaintiff ("the 13 case")[1]; meanwhile, Perrigo and the other three affiliated entities moved to dismiss the 13 case for want of personal jurisdiction.

The court entertained the motion to dismiss first and granted it. (This had the odd result that the only case still pending before the Northern District of Georgia was the 3674 case that had been filed in Nebraska, and only moved to Georgia for reasons of judicial economy.) Merial thus was left only as the defendant in Perrigo's suit for damages stemming from the breach of the Velcera Agreement. The judge then entertained Merial's motion for partial summary judgment in the now-dismissed 13 case. As he acknowledged, "none of the claims in [the 13 case] that Merial

---

[1] This is the case that was originally filed in Georgia, in which Merial was the plaintiff, suing over the Sergeant's Agreement. Because its docket number was 1:15-cv-13, it is referred to in the district court rulings as "the 13 case." The other case, originally filed in Nebraska, in which Perrigo was the plaintiff, is known as "the 3674 case," because its docket number was 1:15-cv-3674.

seeks summary judgment on exist anymore." 267 F. Supp. 3d at 1369.[2] Nevertheless, he held, the court could and should rule on the motion, on the grounds that "the motion's theory of non-liability (for Merial) impacts Perrigo's claims in [the 3674 case] because a finding that it violated the Sergeant's Agreement (i.e., that it was contractually prohibited from selling '329 Patent-infringing products) undermines its claimed damages for Merial's alleged violation of the Velcera Agreement." *Ibid.*

It is that ruling that concerns us today. Neither party, for our purposes, really disputes the chain of events leading up to it; nor is there much of a fight as to what the background law of collateral estoppel is. The entire case comes down to the questions: What did the Georgia court actually say, and how much of what it said, did it *have* to say?

On one level, the ruling of the Georgia court was plain. It treated the Sergeant's and Velcera Agreements as creating simultaneous rights/obligations for Perrigo:

> After Perrigo's Velcera purchase, then, Perrigo and its affiliates possessed both the obligation to not sell infringing product (per the Sergeant's agreement), and the right to sell that product after November 30, 2014 (per the Velcera Agreement).

267 F. Supp. 3d at 1373; *see also id.* at 1372. In this unusual situation, confronting a case of first impression, the district court ruled that the contract-law rule of "last in time" should be applied, so that:

> Under the particular factual circumstances of this case . . . the proper rule must be that when a company or person steps into the shoes of different parties (i.e., occupies the same position vis-a-vis the other party, and has the same rights as the original party) to two contracts

---

[2] It appears Merial's motion actually had both an offensive component (seeking summary judgment in the 13 case) and a defensive component (presenting an affirmative defense for summary judgment in the 3674 case). If so, that would make the Georgia court's decision somewhat less convoluted. However, the record is unclear on this point, because the motion is partially redacted and the brief supporting it is fully sealed. *See* Dkt. 176, *Perrigo Co. v. Merial Ltd.*, No. 1:15-cv-03674 (N.D. Ga.) [hereinafter "N.D. Ga. Dkt."]. In any event, that is not how the Northern District of Georgia presents the situation in its ruling.

> at different times, the terms (and rights and obligations) of the later contract control in the event they conflict with a term or terms of the earlier agreement. . . . The limited assignment exception the Velcera Agreement in fact contained created—because the right to sell under the Velcera Agreement flowed to Perrigo *and* its affiliates, including Sergeant's—the opening for Perrigo to legally circumvent the Sergeant's Agreement's sales ban.

267 F. Supp. 3d at 1374.[3] As a result, Merial's motion for partial summary judgment was denied. *Ibid*. Thus, as far as the dispute before the Northern District of Georgia was concerned, things were resolved: Merial lost its affirmative defense, and the lawsuit went ahead. (In fact, Merial lost again in March 2017, when the judge ruled as a matter of law that Merial had breached the Velcera Agreement. A jury subsequently awarded Perrigo two million dollars after a damages-only trial, albeit out of a requested forty million dollars.)

It is not for us today to review or question that decision, an appeal of which is now pending before the Eleventh Circuit.[4] Sound reasons of both comity and preclusion law prevent us from questioning the Northern District of Georgia's holding as such.[5] Rather, the question before us is to what extent this ruling is preclusive in the Sixth Circuit. And for that purpose, on the other hand, the opinion leaves much unclear. The opinion provides ample rhetorical ammunition to both sides of the dispute before us.

---

[3] The court reasoned that, "[t]o hold otherwise would elevate form over substance and unnecessarily restrict the stream of commerce." *Ibid*. It also cited the fact that Merial had already received over $10M in royalty payments from Perrigo/Velcera (it is unclear which), and thus it would be unfair to deprive "them" (again, it is unclear who is swept under that term) of their side of the deal. *Ibid*.

[4] This was not the case during the proceedings in the Western District of Michigan or in the run-up to oral argument. Merial appears to have been waiting for the Georgia district court to rule on one last motion for post-verdict relief, a renewed motion for judgment as a matter of law, which had been pending before it since May. *See* N.D. Ga. Dkt. 474–78. On October 15, 2019—two days before we heard oral argument—the Georgia district judge ruled on this motion, denying it. N.D. Ga. Dkt. 479. On November 11, 2019, Merial filed a notice of appeal to the Eleventh Circuit. N.D. Ga. Dkt. 481. Therefore, we are in a somewhat delicate situation, as we cannot be sure whether the Eleventh Circuit will eventually reverse the Georgia district court's rule in what was an admitted case of first impression.

[5] We note, however, that we do not adopt this rule as law for our circuit.

The case before us developed when Merial sued Sergeant's in the Western District of Michigan in March 2018, seeking damages for Sergeant's—and only Sergeant's—breach of the Sergeant's Agreement.[6] (I.e., Perrigo, Velcera, and FidoPharm are not parties to this lawsuit.) The Michigan district court granted Sergeant's Fed. R. Civ. P. 12(b)(6) motion to dismiss on the ground of collateral estoppel, finding that the Georgia court had already held that *Sergeant's* could infringe the '329 Patent per the Velcera Agreement. The district court held that all four parts of the collateral-estoppel test were satisfied: that the identical issue was raised and actually litigated in the prior proceeding; that the determination of the issue was necessary to the outcome of the prior proceeding; that the prior proceeding resulted in a final judgment on the merits; and that the party against whom issue preclusion was sought had had a full and fair opportunity to litigate the issue in the prior proceeding. The third and fourth elements of this test are not seriously contested on appeal.

As to the contested question of whether the identical issue was previously litigated, the district court identified the issue as "Merial['s] alleg[ation] that Sergeant's breached the Sergeant's Agreement by making, selling, and offering for sale in the United States infringing Combination Products." Holding that "[t]he same issue was in play before the Georgia Court, both as part of Merial's complaint in the 13 Case and as part of Merial's affirmative defense in the 3674 Case," the Michigan district court reasoned as follows:

> Although Merial does not dispute that Sergeant's was a party in the 13 Case and remains a party in the still-pending 3674 Case, it argues that the Georgia court's order was limited to determining whether *Perrigo* breached the Sergeant's Agreement. As support, Merial cites passages from the order referencing Perrigo but not Sergeant's, and Merial points out that in its analysis, the Georgia court differentiated between the two entities, noting that Sergeant's

---

[6] Sergeant's is incorporated in Michigan.

intent at the time it entered into the Sergeant's Agreement differed from Perrigo's intent at the time it merged with Velcera, thereby acquiring the right under the Velcera Agreement to sell infringing products.

Merial's argument causes the Court to wonder whether it and Merial are reading the same order. It is true that the Georgia court, at times, referred to Sergeant's and Perrigo as separate entities, but such references do not detract from the overall import of the order—that Perrigo, and, therefore, Sergeant's and the other related entities did not breach the Sergeant's Agreement. The Georgia court referred to Perrigo and Sergeant's separately for two purposes: first, to set the background leading up to Perrigo's acquisition of Sergeant's via asset purchase; and second, simply to point out that Perrigo's intent at the time it merged with Velcera and acquired the right to sell under the Velcera Agreement (when it had previously acquired Sergeant's rights under the Sergeant's Agreement) was different from Sergeant's intent and Velcera's intent at the time they signed their respective agreements with Merial. Having recognized that Sergeant's assets (including the Sergeant's Agreement) were transferred to Perrigo via the asset purchase, the Georgia Court had no need to continually refer to Perrigo and Sergeant's together. Nonetheless, the court left no doubt as to the scope of its ruling when it stated that "the right to sell under the Velcera Agreement flowed to Perrigo *and* its affiliates, including Sergeant's." 267 F. Supp. 3d at 1374 (emphasis in original).

The court thus found the identical-issue aspect of the collateral-estoppel test satisfied.

The district court arrived at the same conclusion regarding the necessity element. Its reasoning was that:

The Georgia court's determination that Perrigo, and thus Sergeant's, did not breach the Sergeant's Agreement was necessary to the outcome of the 3674 Case. In fact, in granting Merial's motion to consolidate the two cases, the Georgia court noted that it was "clear" that the court would need to address the Sergeant's Agreement in both cases. As it turned out, the court decided the breach issue in the context of Merial's affirmative defense based on Perrigo's (Sergeant's) alleged breach of the Sergeant's Agreement, which Merial said would bar Perrigo's claim that Merial breached the

> Velcera Agreement. Because Merial raised the issue via its motion
> for partial summary judgment, the court was bound to decide it.

The district court thus dismissed the lawsuit on the grounds of collateral estoppel. It is that

decision, and specifically the two sub-parts of it addressed above, that is on appeal.

## II. STANDARD OF REVIEW

"We review de novo the applicability of collateral estoppel." *In re Markowitz*, 190 F.3d

455, 461 (6th Cir. 1999). Consistent with our standards for reviewing *de novo* the application of

preclusion law, "the party asserting the defense . . . bear[s] the burden of proof." *Browning v. Levy*,

283 F.3d 761, 772 (6th Cir. 2002) (setting out standard of review for *res judicata*) (citing *in re*

*Piper Aircraft Corp., Inc.*, 244 F.3d 1289, 1296 (6th Cir. 2001)).

As the district court correctly noted:

> "The preclusive effect of a federal-court judgment is determined by
> federal common law." *Taylor v. Sturgell*, 553 U.S. 880, 891, 128 S.
> Ct. 2161, 2171 (2008); *see also* Restatement (Second) of Judgments
> § 87 ("Federal law determines the effects under the rules of res
> judicata of a judgment of a federal court."). This rule applies
> regardless of whether the prior federal-court judgment was based on
> federal question or diversity jurisdiction. *See Allied Erecting &*
> *Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 708
> (6th Cir. 2015) ("As this case involves successive diversity actions,
> federal res judicata principles apply.") (quoting *Rawe v. Liberty*
> *Mut. Fire Ins. Co.*, 462 F.3d 521, 528 (6th Cir. 2006)).

Therefore, while this case, like that heard in Georgia, arises out of diversity, we apply the

preclusion doctrines of the federal courts.

## III. ANALYSIS

"Issue preclusion reflects the fundamental principle that courts should not revisit factual

matters that a party previously litigated and another court actually decided." 18 WRIGHT, MILLER,

& COOPER, FEDERAL PRACTICE AND PROCEDURE § 4416 at 424 n.3 (quoting *Miller v. Nichols*,

586 F.3d 53, 60 (1st Cir. 2009)). Repeated and prolonged litigation between the same parties not only is wasteful, but it "implicate[s] a foundational objective of a fair legal system: treating like matters alike." *United States v. United Techs. Corp.*, 782 F.3d 718, 725 (6th Cir. 2015).

Our circuit uses a four-part test for issue preclusion. The elements thereof are not seriously disputed in this case—only the application of two of them. The test has been variously formulated, but the elements remain the same. To establish issue preclusion, a party must show that:

> (1) the question in this case is the same as the one raised in the earlier litigation;
>
> (2) the answer given in the earlier litigation was necessary to the decision;
>
> (3) that decision was a final judgment on the merits; and
>
> (4) the affected party had a "full and fair opportunity" to litigate the issue in the prior litigation.

*Id.* at 725–26 (citing *Kosinski v. C.I.R.,* 541 F.3d 671, 675 (6th Cir. 2008) (quoting *United States v. Cinemark USA, Inc.,* 348 F.3d 569, 583 (6th Cir. 2003))) (line breaks added).[7] We have also

---

[7] Another variant of these factors, substantially the same, is given by *Ark. Coals, Inc. v. Lawson*, 739 F.3d 309, 320–21 (6th Cir. 2014):

> There are four requirements for issue preclusion to apply:
>
> (1) the precise issue must have been raised and actually litigated in the prior proceedings; (2) the determination of the issue must have been necessary to the outcome of the prior proceedings; (3) the prior proceedings must have resulted in a final judgment on the merits; and (4) the party against whom estoppel is sought must have had a full and fair opportunity to litigate the issue in the prior proceeding.

(quoting *Georgia–Pacific Consumer Prods. LP v. Four–U–Packaging, Inc.*, 701 F.3d 1093, 1098 (6th Cir. 2012) (quoting *Cobbins v. Tenn. Dep't of Transp.*, 566 F.3d 582, 589–90 (6th Cir. 2009) (citing *N.A.A.C.P., Detroit Branch v. Detroit Police Officers Ass'n*, 821 F.2d 328, 330 (6th Cir. 1987))))).

The Michigan district court in the instant case chose to cite yet another, substantially similar formulation:

> Issue preclusion applies where: (1) the identical issue was raised and actually litigated in a prior proceeding; (2) the determination of the issue was necessary to the outcome of the prior proceeding; (3) the prior proceeding resulted in a final judgment on the merits; and (4) the party against whom issue preclusion is sought had a full and fair opportunity to litigate the issue in the prior proceeding. *Aircraft Braking Sys. Corp. v. Local 856, Int'l Union, United Auto., Aerospace & Agric. Implement Workers, UAW*, 97 F.3d 155, 161 (6th Cir. 1996) [citing *N.A.A.C.P.*, 821 F.2d at 330].

This is also an appropriate formulation, and we see no meaningful difference, for the purposes of this litigation, among them.

stressed the need for clarity and the concerns of justice. "Because issue preclusion forever precludes litigation with respect to a covered finding, courts err on the side of construing prior ambiguous findings or holdings narrowly." *United Techs.*, 782 F.3d at 729 (emphasis removed). Courts also must ask, "whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." *Cobbins*, 566 F.3d at 590.

In the instant case, Merial contests only the first and second requirements. Merial also makes arguments as to the clarity consideration and as to the considerations-of-justice argument. Therefore, we examine these below, presuming that all parties agree there was sufficient finality and "'full and fair' opportunity to litigate." *United Techs.*, 782 F.3d at 725.

## A. Same Question

The first sub-part of the collateral-estoppel test speaks of the "*same* question" or the "*precise* issue." *United Techs.*, 782 F.3d at 726 (emphasis removed in part); *Ark. Coals*, 739 F.3d at 320 (emphasis added). When a court asks this first question, it seeks to confirm that the prior court considered and ruled on the exact issue that now confronts the court. (This is one of the things that separates issue preclusion from claim preclusion, which looks at the universe of claims that could have been raised but were not.) Thus, we must turn to the language of the Georgia district court's opinion on the partial-summary-judgment motion, 267 F. Supp. 3d. 1364. Unfortunately, as we have already hinted, this opinion contains language that provides strong evidence for both sides.

In favor of Merial's position—which is that the court did not actually rule on the question of whether Sergeant's had breached its obligations under the Sergeant's Agreement—the best argument begins with how the Georgia court itself identified the rule of the case:

> [T]he proper rule must be that when *a company . . . steps into the shoes of different parties . . .* to two contracts at

> different times, the terms (and rights and obligations) of the
> later contract control . . . .

267 F. Supp. 3d at 1374 (emphasis added). The "company" here can *only* be Perrigo; Sergeant's did not step into Velcera's shoes, but rather Perrigo did; and moreover Sergeant's is one of the "different parties" to one of the contracts. Sergeant's could not be stepping into its own shoes.[8] Thus, by its own terms, the rule fashioned in this case applies to *Perrigo* and other similarly situated companies. Sergeant's is not Perrigo, notwithstanding that one owns the other.

Moreover, throughout most of the opinion the Georgia court speaks of Perrigo and only Perrigo. *See, e.g.*, 276 F. Supp. 3d at 1369 (describing the motion the court is addressing purely in terms of Perrigo versus Merial.) This makes sense, because Perrigo was standing in for Velcera, and it was the Velcera Agreement that was at issue there. But that implies, rather strongly, that it is *not* addressing *Sergeant*'s rights and responsibilities in the ruling. The Michigan district court, as we have seen, rejected this argument. In its eyes, the Georgia court referred to Sergeant's separately only "to set the background leading up to Perrigo's acquisition of Sergeant's" and to discuss the different parties' intent in negotiating the various contracts. Otherwise, "[h]aving recognized that Sergeant's assets (including the Sergeant's Agreement) were transferred to Perrigo via the asset purchase, the Georgia Court had no need to continually refer to Perrigo and Sergeant's together." The two become one, in other words, and so every mention of Perrigo necessarily includes a mention of—and ruling as to—Sergeant's. This is not a tenable reading of the Georgia opinion. For one thing, Sergeant's continues to have an independent corporate existence. (*See infra*, pp. 20–22.) For another, even at the very end of the ruling, the Georgia district court still

---

[8] We can see this very clearly when we look at the Georgia court's order on Merial's motion for reconsideration, which states that "Perrigo stepped into Sergeant's and Velcera's shoes for the purposes of the Sergeant's and Velcera Agreements." *Perrigo Co. v. Merial Ltd.*, No. 1:15-CV-3674-SCJ, 2017 WL 5236106, at *1 n.2 (N.D. Ga. Mar. 23, 2017).

speaks separately of Perrigo and Sergeant's, *see* 267 F. Supp. 3d at 1375 n.6. Therefore, Sergeant's cannot either logically or linguistically be assumed to be silently included every time Perrigo is mentioned in the opinion. And since that is true, the maxim of *expressio unius est exclusio alterius*, applied to the repeated mentions of Perrigo and only Perrigo, strongly suggests that the court was not speaking to Sergeant's rights and responsibilities throughout its opinion. Indeed, were that consistently so, Merial would win on this element of the collateral-estoppel test. However, as we are about to see, it is not consistently so.

In favor of Sergeant's there is first and foremost the penultimate line of the court's analysis:

> The limited assignment exception the Velcera Agreement in fact contained created—because the right to sell under the Velcera Agreement flowed to Perrigo *and* its affiliates, *including Sergeant's*—the opening for Perrigo to legally circumvent the Sergeant's Agreement's sales ban. No genuine factual dispute calls that conclusion into question.

267 F. Supp. 3d at 1374–75 (first emphasis in original; second emphasis added). It is hard to ask for more precise language speaking to the "same question" we have than this.

Other language also supports Sergeant's, albeit with a caveat. In particular, the court writes:

> After Perrigo's Velcera purchase, then, Perrigo *and its affiliates* possessed both the obligation to not sell infringing product (per the Sergeant's agreement), and the right to sell that product after November 30, 2014 (per the Velcera Agreement).

267 F. Supp. 3d at, 1373 (N.D. Ga. 2017) (emphasis added). Thus, Sergeant's, as an affiliate of Perrigo, has both the "obligation not to sell infringing product[s]" and the "right to sell that product after November 30, 2014"—and is therefore included within the rule laid down that the latter superseded the former, no? Not so fast. There appears to be an internal contradiction within the

opinion. The district court, earlier in the opinion, gives a definition of the word "affiliate," contained in both the Sergeant's and Velcera Agreements:

> [These agreements] defined "affiliate" of a corporation or business entity as "any other corporation or business entity which controls ... that corporation or business entity." "Control" in turn exists if the other company "owns, directly or indirectly, more than fifty percent" of such corporation or business entity.

267 F. Supp. 3d at 1366 (record citations omitted) (ellipses in original). In other words, the definition of "affiliate," contrary to its normal meaning, traveled up to include owners, but not down to subsidiaries, or horizontally to sibling corporations under the same corporate umbrella. This definition would support Merial's view.

Or so it would seem. But two facts contradict that conclusion. First, in one of the most crucial and contested sentences in the opinion, the court speaks of "Perrigo *and* its affiliates, including Sergeant's"—thus reverting back to the more usual definition of the word, by explicitly sweeping in a subsidiary under "affiliate." *Id.* at 1374. Moreover, on the day before our oral argument, the Georgia district court unsealed a document, Perrigo's response in opposition to Merial's request for partial summary judgment. N.D. Ga. Dkt. 181. This document, as "Doc. 181," is referenced fifteen times in the Georgia district court decision.[9] The Georgia court ruling on which we have been focusing does not reference Doc. 181 for the definition of affiliate common to both the Sergeant's and Velcera Agreements, but Doc. 181 does contain more information on that definition. In addition to the language quoted above, "affiliate," per Doc. 181, turns out to include "any other person or business entity which directly or indirectly controls, *is controlled by* or *is under common control with that Party*." N.D. Ga. Dkt. 181-36 at 2–3. This expanded

---

[9] It was to understand some of these references that our court asked Judge Jones to unseal it. We thank him for his assistance.

definition seems to show that the new Sergeant's/Perrigo Animal Health in fact would have been an "affiliate" under the Velcera Agreement, and thus a party to it once Velcera merged with Perrigo (and thus Sergeant's "[was] controlled by" it), or by virtue of their both eventually becoming subsidiaries ("under common control") of Perrigo. This substantially bolsters the argument that the Northern District of Georgia's rule (and perhaps ruling) applies to Sergeant's.

We hesitate to reach a conclusion by relying on this document, for four reasons. First, this is *Perrigo's* filing, not a court ruling. While the Georgia district court ruling references "Doc. 181" repeatedly, it does not incorporate it. Nor does it reference it for the definition of affiliate.[10] Doc. 181, in other words, does not itself have preclusive effect. It does, to be sure, reinforce the argument that the "same question" that is in play in this lawsuit was raised, in the broadest sense, in the earlier litigation. But (and here we come to our second point), on the other hand, the very fact that the Georgia district court omitted this part of the definition of affiliate suggests that the issue of *Sergeant's* rights and responsibilities (as an affiliate) may not have been particularly strongly litigated. Thirdly, this is Perrigo's document, the response to which is still not unsealed; it may contain counterarguments to which we are not privy.[11] That encourages caution. Finally, and most importantly, we are mindful that this analysis goes to the merits of Perrigo's case, whereas what we are after is the details of the Georgia court's holding. Some overlap is inevitable, especially in the inquiry as to whether the same question was actually litigated. But we must be careful not to blur the two questions too much. It is still genuinely somewhat unclear, notwithstanding Doc. 181, how *the Georgia court* had defined "affiliate" when it wrote, "[a]fter

---

[10] Rather, the Georgia court referenced "Doc. 176," Merial's motion for Partial Summary Judgment to which Doc. 181 was opposed. 267 F. Supp. 3d at 1366; N.D. Ga. Dkt. 176. Doc. 176 is still sealed.

[11] For this reason, we carefully note that our analysis—looking into what this language *suggests* is true as Sergeant's rights under the Velcera Agreement—applies only for the purposes of determining collateral estoppel. We make no holding as to the merits, leaving that to the district court afresh after full briefing.

the Velcera purchase, Perrigo and its affiliates had, simultaneously, the obligation to not sell . . . infringing product . . . (pursuant to the Sergeant's Agreement), and the obligation to not sell that product until November 30, 2014 . . . (pursuant to the Velcera Agreement)." 267 F. Supp. 3d at 1372. Did the district court hold that Sergeant's had a license after the Velcera merger, as Sergeant's now argues? The question remains.

Ultimately, the issue of whether the same question was raised and actually litigated in the previous case is an exceedingly close call—so much so that Merial may have a good claim under our precedents addressing the preclusive effect of a prior decision that is ambiguous or unclear. *See* Part III.C, *infra*. However, because the Georgia court mentions so explicitly in at least one part of its ruling the right of Sergeant's to produce infringing products, we hold that the Georgia court *did* speak to the precise issue before us. Sergeant's narrowly passes this part of the test.

## B.  Necessity

The standard for necessity is a strict one. "The word 'necessary' modifies 'outcome of the proceeding.' 'To say that X is "necessary" to Y is the same thing as saying that it is impossible for Y to exist unless X also exists.'" *Ark. Coals*, 739 F.3d at 321 (quoting *Bies v. Bagley*, 535 F.3d 520, 525 (6th Cir. 2008)) (emphasis removed). Therefore, the test is analogous to but-for cause: but for the decision in question, could the previous ruling have been made?

Here, Merial has the stronger argument. Recall that the motion was cast (or rather, re-construed by the Georgia district court) as a motion for partial summary judgment on an affirmative defense in Perrigo's suit against Merial for granting a license to Ceva and thus breaching the Velcera Agreement:

> "[Merial's] theory of non-liability . .  impacts *Perrigo's* claims . . .
> because a finding that *it* violated the Sergeant's Agreement (i.e., that
> it was contractually prohibited from selling 329 Patent-infringing
> products) undermines *its* claimed damages for Merial's alleged

> violation of the Velcera Agreement. The Court therefore will address Merial's motion.

267 F. Supp. 3d at 1369 (emphases added). In this crucial sentence, in which the court offers the reasoning for its continued consideration of the motion and which thus offers the baseline for necessity, "it" and "its" are singular, and the antecedent of "it" is Perrigo. In suing Merial, Perrigo was acting *qua* Velcera. Merial's response was to allege bad faith or unclean hands (it is unclear which): even if Merial had broken the Velcera Agreement, the argument went, *Perrigo* should not be allowed to collect damages because *it* was breaking the Sergeant's Agreement. *Ibid.* It seems inescapable, then, that the crucial question here was whether *Perrigo* was in the wrong.[12] This is confirmed by the court's formulation of the "rule" of the case, which as we have seen is, "when *a company* . . . steps into the shoes of different parties . . . to two contracts at different times, the terms (and rights and obligations) of the later contract control . . . ." 267 F. Supp. 3d at 1374 (emphasis added). As we have explained above, that rule can only apply to Perrigo. Therefore,

---

[12] Merial itself argues that, "[a]ll the Georgia court needed to do was find that at least one of these plaintiffs [Perrigo, Velcera, Sergeant's, or FidoPharm] could recover damages despite the Sergeant's Agreement," in order for it to lose its motion. The point is not well-developed, and we are not entirely clear on whether or not this is correct. But what does seem clear is that if the Georgia court found that *Perrigo* could infringe—as it did so find—then that was enough for Merial to lose the motion.

> Sergeant's, meanwhile, argues that:

>> [I]t was necessary to determine whether *any* of the Perrigo Entities, including Sergeant's, would be barred from seeking damages from Merial because of a breach of the Sergeant's Agreement. The Georgia Court could not have reached its ultimate conclusion in the Georgia Order without consideration as to each of the Perrigo Entities in Merial's summary judgment motion.

> We see no support for this in the Georgia ruling. Admittedly its posture is convoluted and language confusing. But we do not, for instance, see any independent consideration of "each of the Perrigo Entities." Merial rebuts this argument by saying:

>> [T]he real and necessary question was whether any of them could *recover* damages. Having found that Perrigo could, the Georgia Court did not need to consider the unanswered academic question of whether Sergeant's could not; Sergeant's was not seeking any additional damages specific to it before the Georgia Court, so there was no reason for the Georgia Court to determine whether Sergeant's breached the Sergeant's Agreement.

> Again, we think the overall import of the Georgia opinion is that once Perrigo was found within its rights to infringe, Merial's motion failed.

notwithstanding the dicta that applies, on and off again, to Sergeant's, the ruling did not necessarily

*have* to address Sergeant's liability, *vel non*. In other words, a determination of Sergeant's liability

was not necessary to a determination of Perrigo's liability.

This is confirmed by repeated language in the decision that shows that the court viewed

Perrigo's behavior as the crux of its analysis, and that analysis differentiates Perrigo from

Sergeant's. For instance, at the end of the last paragraph of analysis (which contained the language

seemingly so favorable to Sergeant's, quoted above at p. 13, to the effect that Perrigo and its

affiliates, including Sergeants, could infringe), the Georgia court dropped a footnote:

> Because *the Court finds that Perrigo did not breach the Sergeant's Agreement*, it need not decide whether Merial waived its rights under the contract by accepting royalty payments from Perrigo under the Velcera Agreement. Regardless, the Court notes that waiver is a fact intensive inquiry and here facts support both parties' positions. Acceptance of royalty payments, particularly since the wire transfers came from Sergeant's, suggest that Merial knew or should have known that Sergeant's, as a Perrigo affiliate, was involved in Perrigo's product sales. On the other hand, Merial consistently asserted that the Sergeant's Agreement prohibited Sergeant's from selling infringing product. Under the circumstances, the Court likely could not say that no genuine factual dispute exists such that summary judgment on waiver is appropriate.

*Id.* at 1375 n.6 (emphasis added). Here, we see that the Georgia district court describes its own

decision as one that *Perrigo* had not breached its obligations, while differentiating and discussing

Sergeant's as a separate entity.

Indeed, we see this even in the sentence that forms Sergeant's strongest argument:

> The limited assignment exception the Velcera Agreement in fact contained created—because the right to sell under the Velcera Agreement flowed to Perrigo *and* its affiliates, including Sergeant's—the opening for Perrigo to legally circumvent the Sergeant's Agreement's sales ban.

267 F. Supp. 3d at 1374 (emphasis in original). We have noted above—and Sergeant's has made much of—the language stating that the right to make infringing products "flowed to . . . Sergeant's." But that is actually an aside. The crux of the sentence is that the Velcera Agreement "created . . . the opening for *Perrigo* to legally circumvent the Sergeant's Agreement's sales ban." Thus, even though the court mentions Sergeant's, its conclusions are as to Perrigo and only Perrigo.

Moreover, as we have seen, when the Georgia court described the definition of "affiliate" in both the Velcera and Sergeant's Agreements, it omitted the language most favorable to Sergeant's in this case. *Compare* 267 F. Supp. 3d at 1366 *with* N.D. Ga. Dkt. 181-36 at 2–3; *see* pp. 13–15 *supra*. It seems hard to believe that if the court had thought it *necessary* to speak to Sergeant's rights under the Velcera Agreement, it would have omitted the favorable language.

Our analysis of the Georgia district court's language rests on the continued distinction of Sergeant's from Perrigo, which has been alluded to many times. Even though one owns the other, they remain formally distinct. Perrigo, having bought Sergeant's assets, elected to place them in a subsidiary corporation rather than to use them directly. Though these are formalities, they are not empty formalities. We would, for instance, in most cases shield Perrigo from liability for Sergeant's legal liabilities—i.e., refuse to pierce the corporate veil. The question therefore in part becomes one of corporate law. The Georgia court held that Perrigo inherited both Velcera's and Sergeant's obligations (flowing up). We cannot dispute or disturb that. But does that necessarily mean the reconstituted Sergeant's automatically inherited both sets of obligations and rights (flowing down)? It seems to us that the answer is no.[13] This is especially so as Sergeant's was re-created as a separate entity before Perrigo acquired Velcera.

---

[13] As we have noted, Perrigo may have an argument that it in fact did so, as a matter of contract law. But that goes to the merits in this case. We merely note that this would not have happened automatically, as a matter of corporate law.

The Georgia court, whose focus was elsewhere, often elides the distinction between Perrigo and Sergeant's in its writing—hence the contradictory dicta throughout that opinion. The question of the distinction was much more squarely before the district court in Michigan, on the other hand. It stated that once the Georgia district court had recited the history leading up to Perrigo's acquisition of Sergeant's, the mention of the former necessarily entailed the mention of the latter: "Having recognized that Sergeant's assets (including the Sergeant's Agreement) were transferred to Perrigo via the asset purchase, the Georgia Court had no need to continually refer to Perrigo and Sergeant's together." That cannot be quite right, for not only did Perrigo buy Sergeant's assets, it then created a new corporation, "Sergeant's Pet Care Products, Inc. d/b/a Perrigo Animal Health," with a corporate personality distinct from that of Perrigo (and, as Merial points out, its own "separate brand, assets, and products"). Indeed, the Georgia court, in its recitation of the facts, mentions that Perrigo paid Merial the $2,000,000 royalty payment it was due at the start of the licensing period under the Velcera Agreement "from Sergeant's Pet Care Products, Inc.'s account." 267 F. Supp. 3d at 1368. The Georgia court, thinking of the waiver argument before it, suggests that Merial's failure to object to the source of this payment could be held against it in the 3674 lawsuit. *Ibid.*; *see also id.* at 1375 n.6. But for our purposes, we note that that fact could only matter if the continued corporate distinctions between these three companies had ongoing significance. (And we know, from general corporate law, that it does. *See, e.g.*, *United States v. Bestfoods*, 524 U.S. 51, 61 (1988).)

The Michigan district court's elision of this distinction continues throughout its opinion. It characterized Perrigo as the "successor-in-interest to Sergeant's and Velcera." But Merial is now suing Sergeant's as a separate entity. Thus, sweeping them all into one grouping begs the question in the case before us. Similarly, the Michigan court, in its discussion of the necessity, seems to get

the relationship between the two almost backward, writing that "[t]he Georgia court's determination that Perrigo, *and thus Sergeant's*, did not breach the Sergeant's Agreement was necessary to the outcome of the 3674 Case." (Emphasis added.) It does not seem to us that a determination as to the rightness of Perrigo's behavior would necessarily entail a determination as to ("and thus") the rightness of Sergeant's behavior; surely the parent can act independently of the subsidiary, and in fact, must do so all the time. Shortly thereafter, the Michigan district court speaks of "Merial's affirmative defense based on *Perrigo's (Sergeant's)* alleged breach of the Sergeant's Agreement[.]" (Emphasis added.) We cannot imagine by what rule of corporate law the two can simply be conflated—nor does the district court say. While subsequently unsealed documents in the Georgia case provide somewhat more justification for this approach, they were not available at the time—nor, as we have noted, might they present the entire story. Based on the material before the Michigan court at the time, this conflation cannot be sustained. If it is not sustained, the Michigan court's analysis of whether the Georgia court spoke to the same question as the question before us is undermined, as is the analysis of necessity. Indeed, the latter is fatally undermined. We therefore find that the necessity sub-part of the collateral estoppel test is *not* satisfied and reverse the Michigan district court on that ground.

One last point may be worth addressing. Sergeant's attempts to make much of the fact that Merial's original motion addressed Sergeant's liability as well as Perrigo's. Similarly, the Michigan district court, in an ambiguous line, wrote: "Because Merial raised the issue via its motion for partial summary judgment, the court was bound to decide it."[14] Insofar as either

---

[14] What "the issue" in this line is, is clouded by the Michigan court's insistence throughout the paragraph in question that Sergeant's and Perrigo can be conflated. The Michigan district court's statement clearly refers back to an earlier phrase in the same paragraph, "the breach issue," which in turn refers back to, "[t]he Georgia court's determination that Perrigo, and thus Sergeant's, did not breach the Sergeant's Agreement . . . ." *See* p. 8–9, *supra*. But the Georgia court could in theory have decided the issue of breach as to Perrigo and yet not as to Sergeant's.

Sergeant's or the district court believes that the necessity inquiry is satisfied once an issue is raised in briefs, upon which a motion is later issued, they misunderstand the nature of the test. The test for necessity is whether the previous court could have issued the ruling it did, had it not made the determination which is now at the heart of the collateral estoppel dispute. *See Ark. Coals*, 739 F.3d at 321. Put another way, the focus is on the court ruling, not the parties' briefs, in the prior case.

### B. Lack of Clarity

It is well-established law in this circuit that where the underlying decision is unclear as to what is precluded, it is to be construed narrowly:

> Because issue preclusion forever *precludes* litigation with respect to a covered finding, courts err on the side of construing prior ambiguous findings or holdings narrowly. *See, e.g., Connors v. Tanoma Mining Co.,* 953 F.2d 682, 684 (D.C. Cir. 1992) ("If the basis of [a] decision is unclear, and it is thus uncertain whether the issue was actually and necessarily decided in that litigation, then relitigation of the issue is not precluded."); *In re Braniff Airways, Inc.,* 783 F.2d 1283, 1289 (5th Cir. 1986) ("[I]f reasonable doubt exists as to what was decided in the first action, the doctrine of res judicata should not be applied."); *Harris v. Jacobs,* 621 F.2d 341, 343 (9th Cir. 1980) ("If there is doubt on this score, collateral estoppel will not be applied.").

*United Techs.*, 782 F.3d at 729 (brackets and italics in original). The lack of clarity on the Georgia court's part—at least to the question that concerns us—has already been outlined at length above. *See* pp. 12–17. One example stands out in particular. In summing up, the Georgia court wrote, "[t]he limited assignment exception the Velcera Agreement in fact contained created—because the right to sell under the Velcera Agreement flowed to Perrigo *and* its affiliates, including Sergeant's—the opening for Perrigo to legally circumvent the Sergeant's Agreement's sales ban." 267 F. Supp. 3d at 1374 (emphasis in original). One sentence later, in a footnote, it then added, "the Court finds that Perrigo did not breach the Sergeant's Agreement . . . ." *Id.* at 1375 n.6. Thus, within the space of two lines, the Georgia court's ruling suggests that it covers Sergeant's, then

that it addresses Perrigo only, and then restates that it *finds* that Perrigo (but perhaps not just Perrigo?) did not breach the Sergeant's Agreement. No wonder each side can argue with conviction that its understanding of the Georgia court's ruling is the right one.

This confusion is only amplified by the odd procedural posture in which the Georgia ruling was given. *See supra*, pp. 4–5. *Cf. United Techs.*, 782 F.3d at 729 (refusing preclusion where the previous ruling "was not that clear—and indeed less clear than the above language read by itself suggests.") Under these circumstances, therefore, we hold, in the alternative to our ruling on the ground of necessity, that collateral estoppel is denied on the basis of lack of clarity.

### C.  Interests of Justice

We have held that, "[i]n determining whether the defensive use of collateral estoppel is appropriate, the court must also consider . . . whether it would be otherwise unfair under the circumstances to permit the use of collateral estoppel." *Cobbins*, 566 F.3d at 590 (making it clear this is a separate consideration from the full-and-fair-opportunity-to-litigate part of the preclusion test). Merial raises this argument.

The "unfair under the circumstances" rule is a powerful, amorphous, and necessary part of our collateral-estoppel doctrine. But it is also a potentially disruptive one, for it runs counter to the principles of finality and judicial economy that preclusion law is supposed to uphold. Happily, the application of this rule is not necessary to resolve this case.  Having found for Merial on the grounds of necessity and lack of clarity, we need not—and therefore, do not—rule on this ground of last resort.

### CONCLUSION

For the foregoing reasons, we REVERSE the ruling of the district court and REMAND this case to that court for further proceedings consistent with this opinion.